MORRISON-KNUDSEN CONSTRUCTION CO. ET AL. *v.*
DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES DEPARTMENT
OF LABOR, ET AL.

No. 81–1891.   Argued March 21, 1983—Decided May 24, 1983

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, *post*, p. 638.

*Arthur Larson* argued the cause for petitioners. With him on the briefs were *E. Barrett Prettyman, Jr., Walter A. Smith, Jr.,* and *Richard W. Galiher, Jr.*

*Alan I. Horowitz* argued the cause for the federal respondent in support of petitioners. With him on the brief were *Solicitor General Lee, Deputy Solicitor General Geller, T. Timothy Ryan, Jr., Karen I. Ward, Mary-Helen Mautner,* and *Charles I. Hadden.*

*Geo. S. Leonard* argued the cause and filed a brief for respondent Hilyer.*

---

*Briefs of *amici curiae* urging reversal were filed by *Dennis Lindsay* and *Robert E. Babcock* for the Alliance of American Insurers et al.; by *John C. Duncan III* and *William P. Dale* for the American Insurance Association; by *Thomas D. Wilcox* for the National Association of Stevedores; by *Thomas E. Cinnamond, H. Thomas Howell,* and *Rudolph L. Rose* for the National Council of Self-Insurers; and by *Jed L. Babbin* for the Shipbuilders Council of America.

CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented is whether employer contributions to union trust funds for health and welfare, pensions, and training are "wages" for the purpose of computing compensation benefits under § 2(13) of the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. (part 2) 1425, 33 U. S. C. § 902(13) (Compensation Act).

I

James Hilyer, an employee of petitioner Morrison-Knudsen Construction Co., was fatally injured while working on the construction of the District of Columbia Metrorail System. At the time of his death, Hilyer was covered by the District of Columbia Workmen's Compensation Act, D. C. Code § 36–501 (1973), which incorporates the provisions of the Compensation Act. He was also a beneficiary of a collective-bargaining agreement between Morrison-Knudsen and his union, Local 456 of the Laborers' District Council of Washington, D. C., and Vicinity (AFL–CIO).

Immediately upon Hilyer's death, petitioner[1] began to pay 66⅔% of Hilyer's "average weekly wage" in death benefits to his wife and two minor children pursuant to 33 U. S. C. § 909(b).[2] Respondent Hilyer disputed the amount of benefits paid, claiming, among other things, that her husband's average weekly wage included not only his take-home pay, as

---

[1] Morrison-Knudsen's insurer, the Argonaut Insurance Co., is also a petitioner here. Both parties are referred to collectively as "petitioner."

[2] Section 909(b) requires the employer to pay a surviving husband or wife 50% of the deceased spouse's average weekly wages and each minor child (in excess of one) 16⅔% of the deceased parent's wages. In no event, however, is the amount payable to exceed 66⅔% of such wages. The statute also establishes a minimum level of death benefits by providing that "the average weekly wages of the deceased shall be considered to have been not less than the applicable national average weekly wage" as determined by the Secretary of Labor, § 909(e), so long as benefits do not exceed the deceased's average weekly wage.

petitioner contended, but also the 68¢ per hour in contributions the employer was required to make to union trust funds under the terms of the collective-bargaining agreement.[3] The Administrative Law Judge rejected Mrs. Hilyer's contention and the Benefits Review Board affirmed. The Board reasoned that only values that are readily identifiable and calculable may be included in the determination of wages. Hilyer's rights in his union trust funds were speculative. It was not clear from the record whether his pension rights had vested, and even if they had, the value of his interest in the

[3] In relevant part, that agreement provides:

"Section 5. The parties hereto agree to continue to operate the Health and Welfare Fund known as Laborers' District Council Trust Fund No. 3 for the benefit of the employees covered by this collective bargaining agreement. The Employers agree to pay to such fund an amount equal to twenty-eight cents ($.28) per hour . . . for all hours worked by employees who are covered by this Agreement . . . .

". . . The trustees shall use the payments to the Fund for the benefit of the Subway and Rapid Transit Laborers, their families and dependents, for medical, dental, and/or hospital care, compensation for injuries, and/ or illness resulting from occupational activity, or for unemployment benefits, or for the purchase of insurance covering life and accidental death, accident disability benefits, hospitalization, surgical, medical and sickness benefits. . . .

.      .      .      .      .

"Section 6. Parties hereto agree to continue to operate the Pension and Disability . . . Fund known as Laborers' District Council Trust Fund No. 3 . . . . The employers shall pay such fund . . . thirty-five cents ($.35) per hour for all hours worked by employees . . . .

.      .      .      .      .

". . . The trustees shall use the payments to the Fund for Subway and Rapid Transit Laborers, and their families and shall cover all disability and pension benefits as may in the discretion of the trustees be agreed upon . . . .

.      .      .      .      .

"Section 9. The parties hereto agree to establish and operate a Training Fund for the purpose of insuring adequate trained manpower to perform the work covered by this collective bargaining agreement. The employers agree to pay to such fund . . . an amount equal to five cents ($0.05) per hour for all hours worked by employees . . . ." App. 37–40.

Pension and Disability Fund depended on his continued employment with petitioner, while the value of his interest in the health, welfare, and training funds was contingent on his need for these benefits. The Board also rejected the notion that the values could be computed from the amounts contributed by the employer, noting that the family in all likelihood would not have been able to purchase similar protection at the same cost.

Mrs. Hilyer[4] sought review of the Benefits Review Board's decision in the Court of Appeals for the District of Columbia Circuit, reiterating her contention that her husband's wages included the contributions that his employer made to the union trust funds.[5] The Court of Appeals re-

---

[4] The Director of the Office of Workers' Compensation Programs joined Mrs. Hilyer in her petition for review of the Benefits Review Board's decision. That Office has, however, since readopted its prior understanding that the term "wages" does not include employer contributions to union trust funds. See, e. g., Duncanson-Harrelson Co. v. Director, OWCP, 686 F. 2d 1336, 1343 (CA9 1982). Accordingly, before this Court, the federal respondent has taken a position in support of the petitioner.

[5] Mrs. Hilyer also disputed the manner in which the employer had accounted for the fact that Hilyer had worked for Morrison-Knudsen for only part of the year and had worked for substantially lower wages for the remainder of the year. The employer contended that the average weekly wages should be calculated on the basis of Hilyer's actual wages; Mrs. Hilyer claimed that under 33 U. S. C. § 910(b), his wages should be determined by reference to the wages of a fellow employee "of the same class" who had worked "substantially the whole" of the preceding year. The Benefits Review Board upheld a determination by the Administrative Law Judge in Mrs. Hilyer's favor but modified the amount of attorney's fees awarded under 33 U. S. C. § 928. The employer's and insurer's cross-appeal from that determination was consolidated by the Court of Appeals with Mrs. Hilyer's appeal of the Board's adverse determination on the definition of wages. The court affirmed the decision of the Board to modify the attorney's fees award but did not address the § 910(b) issue. Petitioner did not seek review of the determination on either the attorney's fees issue or the § 910(b) issue. Accordingly, neither determination is before us.

versed. It agreed with the Board that the term "wages" includes only values that are readily identifiable and calculable, but held that the benefits at issue here met that definition. The court reasoned that since the contributions were intended for the benefit of the workers, the trustees could be viewed as "no more than a channel; . . . a means by which the company provides life insurance, health insurance, retirement benefits, and career training for its employees." *Hilyer* v. *Morrison-Knudsen Construction Co.*, 216 U. S. App. D. C. 50, 53, 670 F. 2d 208, 211 (1981). Although the court conceded that the family would not be able to use the employer's contribution to purchase benefits of equivalent value, it relied on *United States ex rel. Sherman* v. *Carter*, 353 U. S. 210 (1957), for the proposition that the employer's contributions were a reasonable measurement of the value of the benefits to the employees.

We granted certiorari, 459 U. S. 820 (1982), and we reverse.

## II

This case involves the meaning of 33 U. S. C. § 902(13), a definitional section that was part of the Compensation Act in 1927, when it became law, and that has remained unchanged through 10 revisions of the Act.[6] The section provides:

> " 'Wages' means the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the injury, including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer, and gratuities received in the course of employment from others than the employer."

[6] The statute was amended in 1934, 1938, 1948, 1956, 1960, 1961, and 1969 to revise or increase benefits. It was amended in 1958 to require employers to maintain a reasonably safe workplace. In 1959, it was amended to allow certain third-party actions. In 1972, the Act was comprehensively revised. See S. Rep. No. 97–498, p. 20 (1982).

■■■■■■■■■■■■■■■■■

## A

We begin with the plain language of the Compensation Act. Since it is undisputed that the employers' contributions are not "money . . . recompensed" or "gratuities received . . . from others," the narrow question is whether these contributions are a "similar advantage" to "board, rent, housing, [or] lodging." We hold that they are not. Board, rent, housing, or lodging are benefits with a present value that can be readily converted into a cash equivalent on the basis of their market values.

The present value of these trust funds is not, however, so easily converted into a cash equivalent. Respondent Hilyer urges us to calculate the value by reference to the employer's cost of maintaining these funds or to the value of the employee's expectation interests in them, but we do not believe that either approach is workable. The employer's cost is irrelevant in this context; it measures neither the employee's benefit nor his compensation. It does not measure the benefit to the employee because his family could not take the 68¢ per hour earned by Mr. Hilyer to the open market to purchase private policies offering similar benefits to the group policies administered by the union's trustees. It does not measure compensation because the collective-bargaining agreement does not tie petitioner's costs to its workers' labors. To the contrary, the employee enjoys full advantage of the Training and Health and Welfare Funds as soon as he becomes a beneficiary of the collective-bargaining agreement. App. 37–38 and 40. He derives benefit from the Pension and Disability Fund according to the "pension credits" he earns. These pension credits are not correlated to the amount of the employer's contribution; the employer pays benefits for every hour the employee works, while the employee earns credits only for the first 1,600 hours of work in a given year. Furthermore, although the employer is never refunded money that has been contributed, the employee can lose credit if he works less than 200 hours in a year or fails to earn credit for

four years. Significantly, the employee loses all advantage if he leaves his employment before he attains age 40 and accumulates 10 credits.[7] *Id.*, at 49–68.

Nor can the value of the funds be measured by the employee's expectation interest in them, for that interest is at best speculative. Employees have no voice in the administration of these plans and thus have no control over the level of funding or the benefits provided. Furthermore, the value of each fund depends on factors that are unpredictable. The value to the Hilyer family of the Health and Welfare Fund depends on its need for the services the Fund provides; the value of the Pension and Disability Fund depends on whether Hilyer's interest vested, see n. 7, *supra*. And the value of the Training Fund, which was established to insure "adequate trained manpower," see n. 3, *supra*, and not for the benefit of the individual workers, is even more amorphous.

*United States ex rel. Sherman* v. *Carter, supra*, is not to the contrary. That case concerned a claim under the Miller Act, 40 U. S. C. § 270a *et seq.*, which requires a contractor working for the United States to furnish a surety bond to insure the payment of "sums justly due" employees. When the employer failed to contribute to the union trust funds as required by the employees' collective-bargaining agreement, the union trustees sued the surety on the bond. The Court allowed the trustees to maintain their action, reasoning that "contributions were a part of the compensation for the work to be done by [the] employees." 353 U. S., at 217–218. The Court did not, however, base its conclusion on the notion these contributions were included in wages. Indeed the Court specifically noted that the Miller Act "does not limit recovery on the statutory bond to 'wages.'" *Id.*, at 217. A far different situation obtains here, where the Compensation Act specifically limits benefits to the worker's "wages." See

---

[7] Since Hilyer worked for Morrison-Knudsen for less than a year, it is probable that his rights in the Pension and Disability Fund did not vest.

also *United States* v. *Embassy Restaurant, Inc.*, 359 U. S. 29, 35 (1959).

### B

We are aided in our interpretation of § 902(13) by the legislative history of the Compensation Act, its structure, and the consistent policies of the agency charged with its enforcement. That history provides abundant indication that Congress did not intend to include employer contributions to benefit plans within the concept of "wages."

In 1927, when the Act was enacted, employer-funded fringe benefits were virtually unknown, see United States Bureau of Labor Statistics, Beneficial Activities of American Trade-Unions, Bull. No. 465, pp. 3–4 (Sept. 1928); cf. S. Rep. No. 963, 88th Cong., 2d Sess., 1–2 (1964). Although the Act was amended several times in the ensuing years, including substantial revision in 1972, there is no evidence in the legislative history indicating that Congress seriously considered the possibility that fringe benefits should be taken into account in determining compensation under the Act.[8] In comparison, over these same years, Congress has acted on several occasions to include fringe benefits in other statutory schemes, see, *e. g.*, the Davis-Bacon Act, 40 U. S. C. § 276a *et seq.*, which was amended in 1964 to bring the United States' wage practices "into conformity with modern wage

---

[8] It is not insignificant that the Senate Report accompanying the 1972 Amendments, which raised the maximum benefit from a specific sum to a multiple of the national average weekly wage, stated: "Today the average weekly wage for private, non-agriculture employees in the United States is $135 a week." S. Rep. No. 92–1125, p. 4 (1972). This figure apparently comes from earnings statistics provided by the Bureau of Labor Statistics, see United States Bureau of Labor Statistics, Handbook of Labor Statistics 1978, p. 321 (1979) (listing data from 1972). The Bureau determines "earnings" by "dividing payrolls by hours. . . . The earnings . . . do not measure the level of total labor costs . . . since *the following are excluded: . . . payment of various welfare benefits . . . .*" *Id.*, at 4. (Emphasis added.)

payment practices." S. Rep. No. 963, *supra*, at 1.[9] From this evidence that Congress was aware of the significant changes in compensation practices, its willingness to amend and enact legislation in view of these changes, and its failure to amend the Compensation Act in the same manner, we can only conclude that Congress did not intend this expanded definition of "wages."[10]

The structure of the Act lends further support for our conclusion; it uses the concept of wages in several ways: to determine disability and survivors' actual benefits, 33 U. S. C. §§ 908 and 909, and to calculate the minimum and maximum level of benefits, § 909(e) (survivors' benefits), § 906(b) (disability benefits). In the latter sense, the reference is to the "national average weekly wage." Since we have often stated that a word is presumed to have the same meaning in all subsections of the same statute, see *Mohasco Corp.* v. *Silver*, 447 U. S. 807, 826 (1980), we would expect the term "wages" to maintain the same meaning throughout the Compensation Act. Accordingly, were we to accept respondent Hilyer's

---

[9] See also, *e. g.*, 46 U. S. C. § 814 *et seq.* (1976 ed. and Supp. V); 39 U. S. C. § 1004 (1976 ed. and Supp. V); 38 U. S. C. § 2003A (1976 ed., Supp. V); 45 U. S. C. § 836; 38 U. S. C. § 4114; 41 U. S. C. § 351 *et seq.*

[10] Recent consideration of this issue by the Senate Committee on Labor and Human Resources is also suggestive. The Committee, which was charged with reviewing administration of the Act to, *inter alia*, "reduce incentives for fraud and abuse [and] to assure immediate compensation," S. Rep. No. 97–498, p. 1 (1982), recommended changing the Act's definition of wages "to confirm past practice and congressional intent and to reaffirm the previously settled rule that fringe benefits are excluded from the definition of 'wages.'" *Id.*, at 41. The Committee would have the definition amended to read:

"The term 'wages' means the money rate at which the service rendered by an employee is compensated . . . . *The term wages does not include fringe benefits, including but not limited to employer payments for or contributions to a retirement, pension, health and welfare, . . . fund or trust for the employee's or dependent's benefit . . . .*" *Id.*, at 3. (Emphasis added.)

argument, we would also have to conclude that in determining the national average weekly wage, the Secretary of Labor is required to evaluate the benefit provisions of collective-bargaining agreements throughout the Nation. Any attempt to make this determination on a national basis would involve deciding which benefits to include, a subject on which different branches of the Government differ, see Chen, The Growth of Fringe Benefits: Implications for Social Security, 104 Monthly Labor Review 3, 9, n. 6 (Nov. 1981).[11] It would also require deciding how the benefits should be evaluated. Evaluating benefits is not simple in "defined contribution" plans such as the one involved in this case; in "defined benefit" plans, where the employer's costs are actuarially determined to provide a certain level of services, the calculation is infinitely harder. See, e. g., the collective-bargaining agreement between General Motors Corp. and the United Auto Workers, cited in App. F to Brief for National Council of Self-Insurers as *Amicus Curiae* 16a. Without clear indication from Congress that this approach with its attendant problems is required, we decline to adopt it.

Finally, we note that, with the exception of the instant case, the Director of Workers' Compensation has consistently taken the position that fringe benefits are not includible in wages, see *Duncanson-Harrelson Co.* v. *Director, OWCP*, 686 F. 2d 1336 (CA9 1982), and letters filed by the Department of Labor in *Levis* v. *Farmers Export Co.*, appeal pending, No. 81–4258 (CA5), and *Waters* v. *Farmers Export Co.*, No. 81–4273 (same). See also U. S. Dept. of Labor, LS/HW Program Memorandum No. 32, June 17, 1968, reprinted in

---

[11] Mrs. Hilyer asked only for the inclusion in wages of Morrison-Knudsen's contributions to union trust funds. Her argument appears to imply, however, that every benefit of her husband's employment should be evaluated to determine his wages. This would seem to require the Secretary of Labor to include in his determination of the national average weekly wage such diverse elements as employer contributions to Social Security, administrative costs of maintaining savings and thrift plans, and the costs of Christmas parties, company outings, or gold watches.

App. to Brief for American Insurance Association as *Amicus Curiae* 1a–4a. Prior to the Court of Appeals' decision in this case, the Benefits Review Board had uniformly rejected the argument pressed by respondent Hilyer. See, *e. g.*, *Waters* v. *Farmers Export Co.*, 14 BRBS 102 (1981); *Freer* v. *Duncanson-Harrelson Co.*, 9 BRBS 888 (1979), rev'd in pertinent part and remanded *sub nom. Duncanson-Harrelson Co.* v. *Director, OWCP, supra; Lawson* v. *Atlantic & Gulf Grain Stevedores Co.*, 6 BRBS 770 (1977); *Collins* v. *Todd Shipyards Corp.*, 5 BRBS 334 (1977). Although not controlling, the consistent practice of the agencies charged with the enforcement and interpretation of the Act are entitled to deference. *NLRB* v. *Hendricks County Rural Electric Membership Corp.*, 454 U. S. 170, 189–190 (1981); *E. I. du Pont de Nemours & Co.* v. *Collins*, 432 U. S. 46, 54–55 (1977). We discern nothing to suggest that Congress intended the phrase "wages" as used in § 902(13) to include employer contributions to fringe benefit plans.

## III

Respondent Hilyer argues that, despite these clear indications to the contrary, the remedial policies underlying the Act authorize the agency and require us to expand the meaning of the term to reflect modern employment practices. It is argued that fringe benefits are advantageous to both the worker, who receives tax-free benefits that he otherwise would have to buy with after-tax dollars, and to the employer, who reduces payroll costs by providing his workers with services that they could not on their own purchase with equivalent dollars. Respondent Hilyer contends that the incentive to trade salary for benefits should not be diluted by failing to consider the value of the benefits in determining survivorship and disability rights.

There is force to this argument, but a comprehensive statute such as this Act is not to be judicially expanded because of "recent trends." *Potomac Electric Power Co.* v. *Director, OWCP*, 449 U. S. 268, 279 (1980). There we recognized that

the Act was not a simple remedial statute intended for the benefit of the workers. Rather, it was designed to strike a balance between the concerns of the longshoremen and harbor workers on the one hand, and their employers on the other. Employers relinquished their defenses to tort actions in exchange for limited and predictable liability. Employees accept the limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail. *Id.*, at 282, and n. 24; H. R. Rep. No. 1767, 69th Cong., 2d Sess., 19–20 (1927); cf. S. Rep. No. 92–1125, p. 5 (1972).

Against this background, reinterpretation of the term "wages" would significantly alter the balance achieved by Congress. As noted above, employer-funded benefits were virtually unknown in 1927; as a result, employers have long calculated their compensation costs on the basis of their cash payroll. Since 1927, however, the proportion of costs attributable to fringe benefits has increased significantly. In 1950, these benefits constituted only 5% of compensation costs; their value increased to 10% by 1970 and is over 15% presently. Chen, *supra*, at 5.[12] According to some projections, they could easily constitute more than one-third of labor costs by the middle of the next century, *ibid.* This shift in the relative value of take-home pay versus fringe benefits dramatically alters the cost factors upon which employers and their insurers have relied in ordering their affairs. If these reasonable expectations are to be altered, that is a task for Congress, *J. W. Bateson Co.* v. *United States ex rel. Board of Trustees*, 434 U. S. 586, 593 (1978).

An expanded definition of wages would also undermine the goal of providing prompt compensation to injured workers

---

[12] See also Handbook of Labor Statistics, *supra* n. 8, at 388–393. The Chen figures are based on data obtained from the United States Department of Commerce. The figures in the Handbook are not identical to Chen's because, as discussed above, the Departments of Commerce and Labor take different views on what benefits are to be included in the calculation of compensation.

and their survivors. Under the Act as presently interpreted, more than 95% of all lost-time injuries are immediately compensated without recourse to the administrative process. In all but 0.1% of the cases, delays averaged less than 10 months. Report by the Comptroller General of the United States, Longshoremen's and Harbor Workers' Compensation Act Needs Amending 31, 41 (Apr. 1982).[13] This situation could well change drastically if every worker could challenge the manner in which his own wages were calculated or the basis used by the Secretary to determine the national average weekly wage.[14]

The language of this statute, Congress' failure to include other benefits that were common in 1972, when the statute was amended, the longstanding administrative interpretation of the Act, and the policies underlying it, all combine to support our conclusion that Congress did not intend to include employer contributions to union trust funds in the Act's term "wages." Accordingly, the judgment of the Court of Appeals is

*Reversed.*

---

[13] The report states that in the 5% of cases that are referred to an administrative law judge, delays average 4–4.5 months, Report by the Comptroller General, at 41. The 1% of cases that are appealed to the Benefits Review Board, *id.*, at 5, are resolved on the average in 10 months, *id.*, at 41. Only 0.1% of all lost-time injuries reach the Courts of Appeals, *id.*, at 5.

[14] It is argued that the standard of living of the injured worker's family will decrease if employer contributions are not included in wages because the family will be required to use a portion of their compensation benefits to purchase health, disability, training, and pension benefits for themselves. This argument is not well taken in the context of survivor benefits; upon the death of the worker, disability, pension, and training benefits have no relevance. Furthermore, under respondent Hilyer's interpretation of the statute, she would be entitled to a death benefit (had her husband's interest in his pension plan vested) as well as the funds necessary to purchase the benefit she has just received. We do not think Congress could have intended to provide this double "recovery." While it is true that once the worker's employment ends, his survivors will be forced to provide for their own health insurance, we do not believe that a statute as complex as this one should be interpreted in light of this single factor.

JUSTICE MARSHALL, dissenting.

On April 19, 1974, James H. Hilyer was run over by a cement truck while working for petitioner Morrison-Knudsen Construction Co. The dispute in this case concerns the calculation of the level of death benefits that should be paid to his widow and their two children. The appropriate level of benefits depends on the meaning of the term "wages" under § 2(13) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U. S. C. § 902(13). The Court of Appeals held that "wages" include employer contributions to union trust funds for health and welfare, pensions, and training.[1] Because I agree with the lower court, I respectfully dissent.

## I

Legislative enactments framed in general terms and designed for prospective operation should be construed to apply to subjects falling within their general purview even though coming into existence after their passage. As this Court has recognized:

> "Old laws apply to changed situations. The reach of [an] act is not sustained or opposed by the fact that it is sought to bring new situations under its terms. While a statute speaks from its enactment, even a criminal statute embraces everything which subsequently falls within its scope." *Browder* v. *United States*, 312 U. S. 335, 339–340 (1941).

In interpreting old enactments, we should focus on the purpose of the statute. "Legislative words are not inert, and derive vitality from the obvious purposes at which they are aimed . . . ." *Griffiths* v. *Commissioner*, 308 U. S. 355, 358 (1939). As Justice Holmes explained:

---

[1] *Hilyer* v. *Morrison-Knudsen Construction Co.*, 216 U. S. App. D. C. 50, 670 F. 2d 208 (1981). The only other Court of Appeals to address this question has reached the same conclusion. *Duncanson-Harrelson Co.* v. *Director, OWCP*, 686 F. 2d 1336 (CA9 1982).

"The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for the courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before." *Johnson* v. *United States*, 163 F. 30, 32 (1908) (Circuit Justice), quoted in *United States* v. *Hutcheson*, 312 U. S. 219, 235 (1941).[2]

In this case, Congress enacted the pertinent statutory language in 1927. "Wages" were defined as "the money rate at which the service . . . is recompensed under the contract of hiring in force at the time of the injury, including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer." Act of Mar. 4, 1927, § 2(13), 44 Stat. (part 2) 1425. The question presented is whether payments made by an employer to union trust funds for the benefit of employees, pursuant to a collective-bargaining agreement, should be deemed "wages" under the Act. As the majority notes, when the Act became law in 1927, employer-funded fringe benefits were "virtually unknown." *Ante*, at 632. Since Congress therefore did not address the matter directly, we must interpret the words of the statute

---

[2] For example, a statute enacted in 1880 before the invention of the automobile might well have applied to "carriages." Suppose that the statute requires all "carriages" to come to a stop before entering a crosswalk near a schoolyard. If the statutory purpose is to assure safety, a court should apply the statute to automobiles. On the other hand, suppose the statute provides that no "carriage" above a certain weight shall be used on a public road unless it is being drawn by at least two horses. If the statutory purpose is to assure that horses are not subject to too great a strain, it obviously follows that the law should not be applied to automobiles. The language of the enactment must be interpreted in light of its purposes. See 2 H. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 1214–1215 (Tent. ed. 1958).

so as to carry out the congressional purpose underlying the Act.

The 1927 Longshoremen's Act was a direct response to decisions of this Court which limited the authority of the States to apply their workers' compensation laws to injured maritime workers. See *Southern Pacific Co.* v. *Jensen*, 244 U. S. 205 (1917); *Knickerbocker Ice Co.* v. *Stewart*, 253 U. S. 149 (1920); *Washington* v. *W. C. Dawson & Co.*, 264 U. S. 219 (1924). In order to fill the void created by those decisions, Congress adopted a federal compensation scheme patterned after existing state workers' compensation laws. S. Rep. No. 973, 69th Cong., 1st Sess., 16 (1926); H. R. Rep. No. 1767, 69th Cong., 2d Sess., 20 (1927). In particular, the 1927 Act was derived from the New York State workers' compensation law, which was deemed one of the most progressive in the country. See *ibid.;* H. R. Rep. No. 1190, 69th Cong., 1st Sess., 2 (1926). The definition of "wages" incorporated in the 1927 Act was lifted almost verbatim from the New York statute. Compare 33 U. S. C. § 902(13) with N. Y. Work. Comp. Law § 201.12 (McKinney 1965).

When Congress acted, the recognized aim of the New York workers' compensation scheme was to compensate for *"the loss of earning power* incurred in the common enterprise, irrespective of the question of negligence." *New York Central R. Co.* v. *White*, 243 U. S. 188, 204 (1917) (emphasis added). In describing the New York law on which the federal scheme was modeled, the New York Court of Appeals had stated: "[C]ompensation awarded the employee is not such as is recoverable under the rules of damages applicable in actions founded upon negligence. *It is based on loss of earning power . . . ."* *Winfield* v. *New York C. & H. R. R. Co.*, 216 N. Y. 284, 289, 110 N. E. 614, 616 (1915) (emphasis added). Accord, *Marhoffer* v. *Marhoffer*, 220 N. Y. 543, 547, 116 N. E. 379, 380 (1917) ("The award is to compensate for loss of earning power"). The Longshoremen's Act, like the New York law, thus focused on an employee's loss of earning ca-

pacity as a result of an occupational injury. See Act of Mar. 4, 1927, §§ 8(c)(21), (e), §§ 10(c), (d), 44 Stat. (part 2) 1428, 1429, 1431; *Vogler* v. *Ontario Knife Co.*, 223 App. Div. 550, 229 N. Y. S. 5 (1928); *Berenowski* v. *Anchor Window Cleaning Co.*, 221 App. Div. 155, 223 N. Y. S. 73 (1927).

Viewed against this background, the term "wages" as used in the 1927 Act should encompass employer-funded benefits because those benefits indisputably represent a portion of the employee's earning power. Union members with various benefits that they have collectively bargained for clearly have a greater earning capacity than employees with equal take-home pay but without such benefits. For the purposes of determining a worker's earning power, there is no principled distinction between direct cash payments and payments into a plan that provides benefits to the employee. If the employer had agreed to pay some fixed amount of money to its employees who, in turn, paid the amount into benefit funds, that amount would satisfy the majority's definition of wages since the benefit has "a present value that can be readily converted into a cash equivalent on the basis of [its] market valu[e]." *Ante*, at 630. In my view, the result should not change simply because the company agrees to eliminate an unnecessary transaction by paying the contributions directly to the trust funds. Employees may bargain to receive their compensation strictly in cash payments or may arrange to forgo a portion of those payments in exchange for certain fringe benefits. There is no reasoned basis for concluding that the employee's earning power should differ depending on which arrangement is chosen.

Fringe benefits now constitute over 15% of employers' compensation costs, and they could easily constitute more than one-third of labor costs by the middle of the next century. See *ante*, at 636. Such benefits are provided in exchange for labor and as a result of bargained agreements. In 1927, Congress explicitly included within the meaning of "wages" the reasonable value of "board, rent, housing, [and]

lodging." At the time, these items were the known noncash components of an employee's earning power. In terms of a modern employee's earning power, fringe benefits are functionally equivalent and should be treated in the same manner.[3]

## II

The majority's initial objection to including employee benefits within the meaning of "wages" involves the problem of valuation. In this case, the employer's contributions to the funds under the terms of the collective-bargaining agreement are readily identifiable: they amount to 68¢ per hour per employee. Yet the majority rejects such a measure, asserting that the employer's cost is "irrelevant in this context." *Ante*, at 630. I disagree. In my view, it is better to be roughly right than totally wrong. The trust funds obviously have *some* value for employees and simply to exclude them from consideration is hardly an appropriate response to uncertainty about their precise value. In addition, the statute itself calls only for inclusion of "the *reasonable* value" of noncash items, 33 U. S. C. § 902(13) (emphasis added). While

---

[3] The majority suggests that the standard of living of an injured worker's family might not decline in the event that the worker is fatally injured. "[U]pon the death of the worker, disability, pension, and training benefits have no relevance." *Ante*, at 637, n. 14. Of course, deceased workers also have no need for employer-provided room or board, but the reasonable value of such benefits is nonetheless included in the calculation of the employee's wages under the Longshoremen's Act. Indeed, none of the normal living expenses that must be provided from the worker's take-home pay continue to be required after a worker dies. This is obviously no reason for ignoring such pay in the calculation of wages. The point here is that all of these elements constitute the basis for the employee's earning power at the time of injury, and for that reason all of these elements should be included in the calculation of "wages." (It should also be remembered that survivors of a deceased employee may receive no more than two-thirds of the employee's "wages," 33 U. S. C. § 909(b), so there is little danger that their standard of living will improve significantly.)

an employer's contribution may understate the true value of the benefits received under the collective-bargaining agreement,[4] it nonetheless provides a readily identifiable and therefore reasonable surrogate for the "advantage" received. An employer's contribution to a trust fund has long been accepted as a reasonable measure of the value of fringe benefits when such benefits are expressly included in a statutory definition of wages. See, *e. g.*, the Davis-Bacon Act, 40 U. S. C. § 276a *et seq.*

The majority also relies heavily on Congress' "failure to amend" the Longshoremen's Act to provide specifically that fringe benefits constitute wages. *Ante*, at 633. Inferring Congress' intent from legislative silence is never an easy task. Such inferences are reasonable only under special circumstances, such as where a well-established agency or judicial statutory construction has been brought to the attention of the Congress, and the Legislature has not sought to alter that interpretation although it has amended the statute in other respects. *United States* v. *Rutherford*, 442 U. S. 544, 554, n. 10 (1979). In this case, there is no evidence that the administrative construction of the term "wages" has been brought to Congress' attention. Similarly, until the decision below, the term "wages" in the Longshoremen's Act had never been judicially defined to include or exclude fringe benefits. And the majority apparently concedes that Congress did not even consider the fringe benefit issue during its consideration of the 1972 Amendments to the Longshoremen's Act. See *ante*, at 632.

---

[4] See *ante*, at 629, 630–631. Of course, this problem already arises with respect to benefits explicitly included under the Act such as "board." For example, an employer may contribute to a fund that provides free meals to its employees. If only because of economies of scale associated with feeding large numbers of employees, the employer's contribution would undoubtedly be less than the price required for employees individually to purchase similar meals on the open market.

The majority emphasizes that "Congress has acted on several occasions to include fringe benefits in *other* statutory schemes." *Ibid.* (emphasis added). The Court points to the Davis-Bacon Act, which historically contained *no* definition of the terms "wages,"[5] but which was amended in 1964 to provide a definition of the term that included fringe benefits. See *ante*, at 632–633. The majority then states that in light of Congress' willingness to amend some legislation but not the Longshoremen's Act, "we can only conclude that Congress did not intend this expanded definition of 'wages.'" *Ante*, at 633. However, the term "wage" or "wages" is used in over 1,200 separate subsections of the United States Code. That Congress has revised the meaning of the term in a few of these provisions hardly controls the meaning of the term in the vast number of other subsections. The notion that Congress has systematically examined existing legislation and amended definitional sections wherever appropriate is sheer fiction.

The majority also points to the "consistent" practices of the agencies charged with interpreting the Act. *Ante*, at 635. The force of this argument is diminished in this case by at least two considerations. First, fringe benefits have only recently begun to represent an appreciable portion of wages. It is for this reason that the meaning of the term "wages" has become a serious administrative issue only in the past few years. For example, the first decision of the Benefits Review Board that addressed the issue of fringe benefits was rendered only six years ago. See *Collins* v. *Todd Shipyards Corp.*, 5 BRBS 334 (1977). This case therefore does not present a situation where an agency's longstanding interpretation of a statute deserves "great weight," cf. *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 275 (1974), and it certainly does not involve a contemporaneous construction of a statute, cf. *E. I. du Pont de Nemours & Co.* v. *Collins*, 432 U. S. 46,

---

[5] See Act of Mar. 3, 1931, ch. 411, § 1, 46 Stat. 1494; Act of Aug. 30, 1935, 49 Stat. 1011; Act of June 15, 1940, ch. 373, § 1, 54 Stat. 399; Act of July 12, 1960, § 26, 74 Stat. 418.

55 (1977). Second, in this very case, the Director of the Office of Workers' Compensation submitted a lengthy brief in the Court of Appeals contending that the Benefits Review Board had "clearly erred" when it excluded the employer's contributions to the union trust funds in computing the decedent's wages. Brief for Petitioner in No. 80–1504 (CADC), p. 9. The Director has now switched sides. Of course, agencies often make mistakes and disavow prior positions, but a call for deference to administrative expertise under these circumstances has a rather hollow ring.

Finally, the majority contends that a change in the manner of calculating wages could "drastically" undermine the goal of prompt compensation of injured workers and their survivors. *Ante,* at 637.[6] This concern is unfounded. As we have previously noted, the Longshoremen's Act "requires the employer to begin making the payments called for by the Act within 14 days after receiving notice of injury without awaiting resolution of the compensation claim and permits withholding of payments only to the extent of any dispute." *Intercounty Construction Corp.* v. *Walter,* 422 U. S. 1, 4, n. 4 (1975), citing § 14 of the Act, 33 U. S. C. § 914. Nor would compensation for employer-funded benefits lead to increased litigation under the Act. As long as fringe benefits are valued at some reasonable amount, the marginal increase in compensation to be gained by challenging the calculation of "wages" will almost certainly be small enough not to warrant resort to the administrative process. In any event, as the

---

[6] The majority hints at problems that would be caused by including in the calculation of wages "the costs of Christmas parties, company outings, or gold watches." *Ante,* at 634, n. 11. The simple answer is that the statute's express reference to recompense "under the contract of hiring" in force at the time of the injury, 33 U. S. C. § 902(13), suggests that the collective-bargaining agreement would provide a simple guide as to which fringe benefits to include in the calculation of wages. In any event, the Secretary of Labor has expressed no problems in calculating wages under those statutes which do require inclusion of fringe benefits.

majority recognizes, such employer contributions are already included within a whole host of statutes, *ante*, at 632–633, and n. 9, yet there is no evidence to suggest that those provisions are administratively cumbersome.[7]

Notably, the Davis-Bacon Act, which covers virtually all construction projects to which the United States or the District of Columbia is a party, applied to the very project on which Mr. Hilyer was working at the time of his death. That Act requires, *inter alia*, that all contractors and subcontractors make payments in accordance with prevailing wage determinations made by the Secretary of Labor, and requires contractors to post a scale of wages at the site of work. 40 U. S. C. § 276a(a). All wage determinations must include fringe benefits, § 276a(b), and the statute has been administered smoothly in this fashion for nearly 20 years. Thus, in this case, an accepted measure of the deceased's wages—including employer contributions—was readily available.

## III

Shortly after the Longshoremen's Act became law, this Court stressed that it "should be construed liberally in furtherance of [its] purpose . . . and, if possible, so as to avoid incongruous or harsh results." *Baltimore & Philadelphia Steamboat Co.* v. *Norton*, 284 U. S. 408, 414 (1932). In my

---

[7] Inclusion of fringe benefits in the compensation calculations has proved quite feasible in such diverse contexts as the Federal Employees Compensation Act, see 5 U. S. C. § 8101(12); *United States* v. *Crystal*, 39 F. Supp. 220 (ND Ohio 1941), the Miller Act, see *United States ex rel. Sherman* v. *Carter*, 353 U. S. 210 (1957), and state workers' compensation schemes, *e. g.*, *Hite* v. *Evart Products Co.*, 34 Mich. App. 247, 191 N. W. 2d 136 (1971). Even the existing calculation of wages under the Longshoremen's Act requires valuation of overtime, *Gray* v. *General Dynamics Corp.*, 5 BRBS 279 (1976), vacation pay, *Baldwin* v. *General Dynamics Corp.*, 5 BRBS 579 (1977), meals furnished employees, see *Harris* v. *Lambros*, 61 App. D. C. 16, 56 F. 2d 488 (1932), and such exotic items as automobile parts, *Carter* v. *General Elevator Co.*, 14 BRBS 90 (1981).

view, it would be incongruous to allow an employee's fringe benefits to rise without any corresponding protection in the event of injury or death, and harsh simply to ignore part of an employee's earning power when calculating benefits for his survivors. Because the majority's narrow construction of the term "wages" is fundamentally at odds with Congress' purpose in enacting the compensation scheme, I dissent.