This is a workmen's compensation case.
The prior opinion of this court, International Paper Co. v.Murray, 490 So.2d 1228 (Ala.Civ.App. 1984), has been reversed and remanded by the Supreme Court. On remand to this court, and in compliance with the Supreme Court's opinion, Ex parteMurray, 490 So.2d 1230 (Ala. 1984), we now reconsider the issue of whether notice was given to International Paper of Murray's injury and, if so, when.
We decided in our earlier opinion that there was no evidence to support a conclusion that actual notice was given to International Paper within five days of Murray's injury as required by § 25-5-78, Code of Alabama 1975. InternationalPaper Co. v. Murray, supra. The supreme court concurred with that finding. Ex parte Murray, supra.
The supreme court has said that if there is "good reason" for failure to give notice of injury within five days and actual notice is given within the ninety-day period provided as an absolute limitation by § 25-5-78, no forfeiture of benefits will apply. Ex parte Murray, supra. For the reasons stated in our earlier opinion, however, we find that there was not "good reason" for Murray's failure to notify International Paper within five days that he had been hurt while on the job. Id.
Since we find no "good reason" to excuse compliance with the five-day § 25-5-78 limit, and we find evidence of actual notice within the ninety-days, we now must determine on what date
notice was given "and impose the sanction of non-payment [of benefits] up to that time." Ex parte Murray, supra.
There are three possible dates after the five-day period but within the ninety-day period on which the trial court could have concluded that notice was given. These dates are, April 22, 1981 (when Murray and his wife testified that he called International Paper); April 23, 1981 (recorded "call-in"); and May 25, 1981 (when the bill for Murray's treatment and surgery was received by International's personnel office).
Murray said that when he called in on April 22, he talked to a black woman at the plant named "Elsie." He said that he told "Elsie" that he had injured himself at work and was going to see the doctor. Murray's wife testified that she partially overheard this conversation.
The supervisor of the mill superintendent's office at International Paper (through which absentee reports were made and routed) testified that there was no black woman named "Elsie" working in the mill superintendent's office when Murray was injured. The woman who Murray claimed was "Elsie," Brenda Hendrix, testified at trial that "she had never been called Elsie, had never answered to Elsie, and had never identified herself as Elsie." She did admit *Page 1236 
to taking a call from Murray on April 20. That call-in, which was recorded, contained no notice of an on-the-job injury.
Therefore, other than the testimony of Murray and his wife, there is no evidence to support Murray's claim that he called in on April 22nd. Brenda Hendrix was not asked at trial whether she took a call-in report from Murray on April 22nd. (The parties' questioning of her was largely limited to whether or not she might have made a mistake on what she wrote down on the recorded April 20th call-in.) However, with the corroborating testimony of the established absentee reporting system (as indicated by the recorded days that Murray did call in), the trial court could have concluded that he did call as he and his wife testified. The April 23 call-in report is not specific regarding why Murray is "going in hospital." From a complete examination of the record, the next possible date that International could be found to have received notice is when personnel received the May 25th bill. Because we cannot tell on what date the trial court found that notice was given, we remand the case to the trial court for determination of when notice was given, and direct it to enter its award of compensation from that date forward.
We have found that Murray's claim is not barred by failure to give notice as required by § 25-5-78 (as that section is now interpreted by Ex parte Murray, supra). We must now address those issues raised by International Paper on appeal which were originally pretermitted by the notice issue.
International Paper contends that the trial court erred in including the $10.80 weekly premium value of a medical, hospitalization, and life insurance policy when it determined Murray's average weekly wage. Although we find no Alabama case on point, the United States Supreme Court has addressed a similar issue in Morrison-Knudsen Construction Company v.Director, Office of Workers' Compensation Programs, UnitedStates Department of Labor, 461 U.S. 624, 103 S.Ct. 2045, 76 S.Ct. 2d 194 (1983). In that case, the Court considered whether employer contributions to union trust funds for health and welfare, pensions and training were "wages" (as defined by33 U.S.C. § 902 (13)) for the purposes of determining the average weekly wage of a claimant under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901-950 (1978).Morrison-Knudsen, supra.
The LHWCA was adopted in 1927 as a federal compensation plan for maritime workers, and was patterned after existing state workers' compensation laws. Morrison-Knudsen, supra. The LHWCA defines "wages" as follows:
 "`Wages' means the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the injury, including the reasonable value of board, rent, housing, lodging or similar advantage received from the employer, and gratuities received in the course of employment from other than the employer."
33 U.S.C. § 902 (13)(1978). By comparison, the definition of "wages" under Alabama Workmen's Compensation law includes, in addition to "earnings," the following:
 "Whatever allowances of any character made to an employee in lieu of wages are specified as part of the wage contract shall be deemed a part of his earnings."
§ 25-5-57 (b), Code of Alabama 1975. The LHWCA is a workmen's compensation statute similar to our own, where employers have "relinquished their defenses to tort actions in exchange for limited and predictable liability." Morrison-Knudsen, supra.
Based on the similar nature of the two acts, and on the apparently synonymous "similar advantage" and "whatever allowances" language used in the respective statutory wage definitions, Morrison-Knudsen serves as useful precedent here. The precise holding in that case is that employer contributions to fringe benefit plans are not "wages" for the purpose of computing compensation benefits. Morrison-Knudsen, supra.
Larson's The Law of Workmen's Compensation, which was highly critical of the result in the case *Page 1237 
below, Hilyer v. Morrison-Knudsen Construction Company,670 F.2d 208 (D.C. Cir. 1981), supports the Supreme Court's conclusion as the only reasonable one. 2 A. Larson, The Law ofWorkmen's Compensation, § 60.12 (b) (Supp. 1983). (In the Hilyer
case the D.C. Circuit Court had ruled that employer funded benefits were includable under the LHWCA). Larson contends that the primary reason for calculating the average weekly wage is to determine what has in fact been lost, and that fringe benefits "are not a value that, first, form part of the standard of living, and secondly and more importantly, are not in any meaningful sense lost as the result of the death or injury." 2 A Larson, supra. Larson contends that:
 "[C]ontributions to a fringe benefit designed to provide hospital or medical care can hardly be considered `lost' when the very event in question, compensable injury, entitles the employee to unlimited hospital and medical [care]."
2 A. Larson, supra. The same logic would also apply to the question of whether the value of a life insurance policy premium should be included in determining the average weekly wage.
Furthermore, both the Supreme Court and Larson feel that determination of the "value" of fringe benefits so that they might be included in computations of compensation due could be an unmanageable task, with case-by-case determination in thousands of compensation cases. Morrison-Knudsen, supra; 2 A. Larson, supra. Larson states that such a path, if chosen, would lead to the disruption of a workable process for determining what "wages" are that has been followed for over seventy years in millions of compensation cases. 2 A. Larson, supra.
For similar reasons as the above, we conclude that § 25-5-57
(b), Code of Alabama 1975, does not contemplate the inclusion of these employer-paid health insurance premiums in the determination of the average weekly wage.
International Paper next argues that the trial court erred when it determined that Murray's average weekly wage (exclusive of the insurance premium) was $330. The trial court apparently based that finding on Murray's testimony that he was earning $8.25 per hour at International Paper when he was injured. International Paper contends that the evidence that it submitted (Murray's 1980 earnings) would only support an average weekly wage of $303. Neither figure is correct.
The determination of an employee's average weekly wage is controlled by § 25-5-57 (b). Murray falls under the second sentence of § 25-5-57 (b). The application of that section in determining the average weekly wage of an employee who, like Murray, has worked more than fifty-two weeks in the same employment is mandatory. Orkin Exterminating Co. v. Williams,389 So.2d 935 (Ala.Civ.App. 1980). Section 25-5-57 (b) requires that Murray's average weekly wage be computed by dividing by fifty-two the amount of his earnings at International Paper during the fifty-two-week period immediately preceding his April 15, 1981, injury. § 25-5-57 (b), Code 1975; Orkin, supra.
The last issue raised by International Paper can be best addressed by dividing it into two subparts.
The first is International Paper's contention that the trial court erred in finding that Murray had suffered any loss of earning capacity. We perceive that there was legal evidence from which the trial court could have concluded that Murray suffered a loss of earning capacity as a result of his accident. His injury was sufficiently severe to require extensive treatment, hospitalization, and surgery. He was left with physical restrictions upon the types of work or recreational activities he could perform. If there is any legal evidence to support the trial court's finding or conclusion in a workmen's compensation case, it is due to be affirmed. Youngv. City of Huntsville, 342 So.2d 918 (Ala.Civ.App. 1976).
Second, International Paper contends that the trial court also committed error by *Page 1238 
failing to determine what percentage decrease in earning capacity Murray suffered. The trial court determined Murray's "decrease in weekly earning capacity" by subtracting his "proposed average weekly wage" (after injury) of $240 from the average weekly wage (prior to injury) that it had calculated to be $340.80. This method, which was used to arrive at a finding of a "decrease in weekly earning capacity . . . of $100.80," is incorrect.
First, the trial court must determine that there has been a loss of earning capacity. Webb Timber Company v. Milton,365 So.2d 101 (Ala.Civ.App. 1978). Indeed, "the basis for compensation is the decrease in earning capacity." Allen v.Metro Contract Services, Inc., 421 So.2d 1289 (Ala.Civ.App. 1982). The trial court did this. However, that loss in earning capacity must be expressed as a percentage. Alabama By-ProductsCo. v. Landgraff, 248 Ala. 253, 27 So.2d 215 (1946). The statute used to facilitate the determination of the employee's loss of earning capacity (here § 25-5-57 (a)(3)(g)) "does not prescribe comparative wages received before and after the injury as the test of the employee's ability to earn." GoodyearTire Rubber Co. v. Downey, 266 Ala. 344, 96 So.2d 278 (1957).See also Goodyear Tire Rubber Co. v. Corfman, 424 So.2d 1326
(Ala.Civ.App. 1982). The trial court may use that difference as one of the factors it considers to arrive at the percentage of the employee's loss of ability to earn. Goodyear Tire RubberCo. v. Downey, supra. There are many other factors, however, that may be considered, including age, experience, education, etc. Allen v. Metro Contract Services, Inc., supra. The percentage of disability and the percentage of loss of abilityto earn may be different. Allen v. Diversified Products,453 So.2d 1063 (Ala.Civ.App. 1984). The trial court may consider all of the evidence, and is not even bound by the testimony of experts in its determination of the percentage of loss of ability to earn. Allen v. Diversified Products, supra. Because the "before and after" wages and the loss of earning capacity may be quite different, the trial court must assign apercentage loss of ability to earn before any award of compensation can be calculated. Alabama By-Products Co. v.Landsgraff, supra.
Therefore, we affirm the trial court's finding that Murray gave actual notice to International Paper within the required ninety-day period. We must remand on that issue, however, with instructions that the trial court determine on what day notice was given, and begin compensation as of that date. We affirm the court's finding that Murray suffered a loss of earning capacity, but remand on that issue with instructions that the trial court determine Murray's percentage loss of earning capacity. We reverse the judgment of the trial court insofar as it pertains to the computation of Murray's average weekly wage, and remand with instructions that a judgment not inconsistent with this opinion be entered.
AFFIRMED IN PART; REVERSED IN PART; and REMANDED WITH DIRECTIONS.
BRADLEY and HOLMES, JJ., concur.