HARRY A. SCHLOTFELD, APPELLEE AND CROSS-APPELLANT, V. MEL'S HEATING AND AIR CONDITIONING, APPELLANT AND CROSS-APPELLEE, AND WALDINGER CORPORATION, APPELLEE.

445 N.W.2d 918

Filed September 22, 1989.    No. 88-1009.

Stephen L. Ahl, of Wolfe, Anderson, Hurd, Luers & Ahl, for appellant.

Michael G. Goodman, of Matthews & Cannon, P.C., and Gary M. Bodnar for appellee Schlotfeld.

Walter E. Zink II and Michael A. England, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellee Waldinger Corporation.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Mel's Heating and Air Conditioning appeals from the award of the Workers' Compensation Court on rehearing finding that the accident which occurred while appellee Harry A. Schlotfeld was employed by appellant was the sole and proximate cause of Schlotfeld's disability and determining to extend the period that Schlotfeld was temporarily totally disabled. Schlotfeld cross-appeals from the compensation court's award excluding certain fringe benefits from calculation of the average weekly wage upon which his compensation award is based.

On May 27, 1986, Schlotfeld was employed by Mel's as an apprentice sheet metal worker. While helping with the installation of a new ventilation system, Schlotfeld was lifting a fitting for metal ductwork when he felt a sudden, extreme pain in his lower back with pain shooting through the buttocks and down his right thigh. In pain, and unable to straighten up, he left work early and went to see his physician, Dr. James Steier. Dr. Steier admitted Schlotfeld to the hospital for conservative treatment consisting of bed rest, heat application, physical therapy, muscle relaxation medication, and pain medication. Schlotfeld was released to return to work on June 24, 1986, without restriction, with a diagnosis of an acute lumbar strain.

After being discharged from the hospital, Schlotfeld's back was sore, and he suffered constant discomfort with bouts of extreme pain. He was under the impression that his back pain was part of the healing process and that the pain was not enough to warrant going to the physician.

In March 1987, Schlotfeld was working for Olson Bros., Inc., as an apprentice sheet metal worker. On March 19, 1987, he suffered low back pain after lifting a 30-inch elbow—the same type of pain in the same area of his back as he experienced on May 27, 1986, while working for Mel's. On March 20, 1987, Schlotfeld returned to see Dr. Steier because the pain got to the point where he had to have some relief. According to Schlotfeld, he went to see his physician again not because of back strain suffered while working on March 19, 1987, but because of the continuation of pain. Dr. Steier ordered Schlotfeld to take 2 days off from work and then released him to return to work without restriction.

There was evidence that Schlotfeld filled out a workers' compensation report of injury involving the incident on March 19, 1987, when he was moving the 30-inch elbow. However, Schlotfeld denies that he had an accident on March 19, 1987, while working at Olson Bros.

In May 1987, Schlotfeld was working for Waldinger Corporation as a sheet metal worker. On May 7, he worked an ordinary day without incident. The following morning, May 8, 1987, he was unable to get out of bed. He again went to see Dr. Steier.

When Schlotfeld's back failed to improve with conservative treatment, Dr. John Greene, a neurological surgeon, was consulted. After an MRI scan showed a minimal diffuse bulging disk at L4-5 and a myelogram revealed a disk herniation at L4-5 and disk bulging without herniation at L5-S1, surgery was recommended and carried out.

On September 22, 1987, Schlotfeld filed a petition in the Workers' Compensation Court, alleging two accidents, one on May 27, 1986, while working for Mel's, and one on May 7, 1987, while he was employed by Waldinger Corporation. After the initial hearing, one judge of the court concluded that all of Schlotfeld's injuries resulted from the first accident while

employed by Mel's, and dismissed the claim against Waldinger. The court awarded Schlotfeld $208 per week for a period of $20^3/_7$ weeks for temporary total disability, terminating on August 31, 1987, and $52 per week for a period of $279^4/_7$ weeks for 25 percent permanent partial disability to the body as a whole.

Mel's requested a rehearing. After rehearing, the compensation court found that all of Schlotfeld's injuries resulted from the first accident. Excluding money paid by Mel's to Schlotfeld's union as a result of Schlotfeld's employment, the court reduced Schlotfeld's award for temporary total disability from $208 per week to $118.20 per week. However, the court increased the amount of time Schlotfeld was to be considered temporarily totally disabled to May 23, 1988, and thereafter for as long as Schlotfeld remained temporarily totally disabled. No finding as to permanent disability was made at that time. As a result of the extension of the temporary total disability period, together with an increase in the amount awarded for medical expenses, and even considering the lower weekly award and the elimination of the permanent partial disability award, the total dollar amount of the judgment awarded Schlotfeld on rehearing exceeded the total amount of the judgment on the first hearing. Accordingly, the court on rehearing awarded Schlotfeld attorney fees of $1,500.

According to the record, Schlotfeld was paid wages of $6.14 per hour while working for Mel's. However, in addition thereto, and pursuant to the union contract with Mel's, an additional $2.31 per hour was paid to the union for every hour Schlotfeld worked to cover health and welfare, pension, a local training fund, and the national training fund. This was apparently a standard contract which applied equally to all employees regardless of their base wage. The record does not reveal whether these benefits were available to Schlotfeld when between jobs, or whether he had to make any contributions on his own to continue to be a recipient of any possible benefits from health and welfare and pension.

On appeal, Mel's assigns as error the finding by the compensation court that the accident of May 27, 1986, while Schlotfeld was working for Mel's, was the cause of Schlotfeld's

disability and the finding by the court on rehearing that Schlotfeld's award on rehearing was greater than his initial award so as to entitle him to an attorney fee. Schlotfeld cross-appealed, contending that the court erred in fixing his wages at $6.14 per hour, the amount actually paid him, rather than the correct wage, including the fringe benefits earlier set forth, totaling $8.45.

Dr. Greene, in a letter dated November 5, 1987, stated that based on the history given him by Schlotfeld, the appellee Schlotfeld herniated his disk as a result of the May 1986 injury. He testified to the same effect in a deposition taken on May 12, 1988.

Dr. Steier testified by deposition taken on May 16, 1988, that in his opinion Schlotfeld's injury and disability resulted from his accident of May 27, 1986, while he was working for Mel's. In a later, supplemental deposition taken of Dr. Steier on June 28, 1988, when told about the alleged second accident of March 19, 1987, he stated that if such an accident did in fact happen, it would be a contributing cause of Schlotfeld's present disability. However, on further questioning, he stated again that he believed the accident of May 27, 1986, was the cause of Schlotfeld's problem.

Taking the testimony of the two physicians and Schlotfeld's denial of a 1987 accident, a question of fact was presented to the compensation court, which found in favor of Schlotfeld. There was sufficient competent evidence to support such a conclusion.

The findings of fact made by the Workers' Compensation Court after rehearing have the same force and effect as a jury verdict in a civil case and will not be set aside unless clearly wrong. Neb. Rev. Stat. § 48-185 (Reissue 1988); *Alley v. Titterington, ante* p. 71, 443 N.W.2d 615 (1989). In testing the sufficiency of the evidence to support the findings of fact made by the Workers' Compensation Court after rehearing, the evidence must be considered in the light most favorable to the successful party. *Alley, supra.*

In its second assignment of error, Mel's contends that the compensation court erred in awarding attorney fees, because, in fact, on rehearing that court eliminated the permanent

disability award and reduced the amount of the weekly payments. However, as we have pointed out, with the running award as to temporary total disability and the increased award for medical expenses, the net amount of the judgment was increased.

Neb. Rev. Stat. § 48-125 (Reissue 1988) provides in pertinent part as follows:

> If the employer files an application for a rehearing before the compensation court from an award of a judge of the compensation court and fails to obtain any reduction in the amount of such award, the compensation court shall allow the employee a reasonable attorney's fee to be taxed as costs against the employer for such rehearing . . . .

Ordinarily, the phrase "reduction in the amount of such award" found in § 48-125 refers to the total amount of the award to the employee. See, *Behrens v. American Stores Packing Co.*, 228 Neb. 18, 421 N.W.2d 12 (1988); *Pollard v. Wright's Tree Service, Inc.*, 212 Neb. 187, 322 N.W.2d 397 (1982). This court interprets the portion of § 48-125 at issue in this case to mean the employee will be awarded an attorney fee if the employer requests the rehearing and the total dollar award after rehearing is not less than the amount of the original award.

In *Beavers v. IBP, Inc.*, 222 Neb. 647, 385 N.W.2d 896 (1986), the court held that the compensation court should have awarded the injured employee an attorney fee on rehearing. The court stated:

> As noted earlier, the compensation court on rehearing . . . doubled the amount of permanent partial disability benefits from a 15-percent disability of the body as a whole to a 30-percent loss of earning power, thereby increasing IBP's potential liability for permanent partial disability from $9,798.97 to $19,597.95. Obviously, IBP did not, by its application for rehearing, obtain any reduction in the amount of Beavers' award on original hearing.

*Id.* at 654, 385 N.W.2d at 900.

The plaintiff in *Mulder v. Minnesota Mining & Mfg. Co.*, 219 Neb. 241, 361 N.W.2d 572 (1985), was originally awarded

compensation for temporary total disability from September 1, 1982, through the date of the hearing, February 17, 1983, and thereafter so long as he remained totally disabled. Upon rehearing, the plaintiff was awarded compensation for temporary total disability from September 1, 1982, through March 1, 1983, and compensation for permanent partial disability for 274 weeks thereafter. The court decided that, under the circumstances of the case, an award for permanent partial disability on rehearing following an initial award only for temporary total disability entitled the plaintiff to an award of an attorney fee for the rehearing before the compensation court.

An award of attorney fees was upheld in *Sidel v. Travelers Ins. Co.*, 205 Neb. 541, 288 N.W.2d 482 (1980). According to the court:

> The contention that the plaintiff was not entitled to an attorney's fee under the provisions of section 48-125, R.R.S. 1943, because on rehearing the injury of July 11, 1978, was found to be noncompensable and medical expense in connection therewith was disallowed, is not meritorious. *The plaintiff did receive a net increase in compensation on rehearing.*

(Emphasis supplied.) *Sidel, supra* at 549, 288 N.W.2d at 486.

It is clear that the compensation court did not act outside the scope of its authority on rehearing when it awarded Schlotfeld compensation for an additional period of temporary total disability and for increased medical expenses. Equally clear is the fact that it is the net increase or decrease in a compensation award after rehearing that determines whether or not the employee is awarded an attorney fee. Mere reduction of one aspect of the compensation award without a corresponding reduction of the total award does not mean the employer obtained a reduction of the award such that the employee is not entitled to an attorney fee.

Schlotfeld's cross-appeal claims the compensation court erred in fixing his wage at $6.14 per hour instead of $8.45 per hour.

At the time of the May 27, 1986, accident, Schlotfeld was a member of the Sheet Metal Workers' International

Association. The union had negotiated, on behalf of its members, a total wage package that was to be paid by employers who hired workers from the union hall. That package consisted of a base wage that was dependent upon whether the worker was an apprentice or a journeyman (in the case of Schlotfeld it was $6.14 per hour), plus the following amounts to be paid by the employer to the union: $1.60 per hour for health and welfare, $.60 per hour for pension benefits, $.05 per hour for a local training fund, and $.06 per hour for the national training fund. The amount paid to the union did not vary depending upon whether the worker was married, whether he or she had any children, or the worker's age.

Schlotfeld's W-2 form showed wages of $6.14 per hour. According to Schlotfeld's testimony, he pays taxes only on the $6.14 per hour, and he never sees the $2.31 in "fringe benefits." The employer gives that money to the union for the various above-mentioned funds.

However, Schlotfeld claims that the $2.31 per hour paid to the union is part of his wage for the purpose of calculating the compensation to which he is entitled.

Neb. Rev. Stat. § 48-126 (Reissue 1988) provides in part:

Wherever in the Nebraska Workers' Compensation Act the term wages is used, it shall be construed to mean the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the accident. It shall not include gratuities received from the employer or others, nor shall it include board, lodging, or similar advantages received from the employer, unless the money value of such advantages shall have been fixed by the parties at the time of hiring, except that if the insurance carrier shall have collected a premium based upon the value of such board, lodging, and similar advantages, then the value thereof shall become a part of the basis of determining compensation benefits.

It is Schlotfeld's position that the amount paid to the union was part of the "money rate" at which his work was recompensed.

There is a split of authority on the issue of whether fringe benefits should be included in the wage calculation for the

purpose of workers' compensation. The majority position excludes fringe benefits from the wage calculation. 2 A. Larson, The Law of Workmen's Compensation § 60.12(b) (1989).

The majority position is exemplified by the decision of the U.S. Supreme Court in *Morrison-Knudsen Constr. Co. v. Director, OWCP,* 461 U.S. 624, 103 S. Ct. 2045, 76 L. Ed. 2d 194 (1983), *rev'g, Hilyer v. Morrison-Knudsen Const. Co.,* 670 F.2d 208 (D.C. Cir. 1981). In *Morrison-Knudsen,* the Court held that an employer's contributions to union trust funds for health and welfare, pensions, and training are not "wages" for purposes of computing compensation benefits under the Longshoremen's and Harbor Workers' Compensation Act. Under the act,

> "Wages" means the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of injury, including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer, and gratuities received in the course of employment from others than the employer.

33 U.S.C. § 902(13) (1982). According to the Court, the employer's contributions to union trust funds were not " 'money . . . recompensed' or 'gratuities received . . . from others,' " and therefore the narrow question was whether the contributions were a "similar advantage" to board, rent, housing, or lodging. 461 U.S. at 630.

The Court held that the contributions were not a similar advantage. Board, rent, housing, and lodging were found to be benefits with a present cash value that can be readily converted into a cash equivalent on the basis of their market values, while the present value of the trust funds could not be so easily converted into a cash equivalent.

The suggestion that the value of the trust funds be calculated by reference to the employer's cost of maintaining the funds was rejected. According to the Court, the employer's cost was irrelevant, measuring neither the employee's benefit nor his compensation. The employer's cost does not measure the benefit to the employee because the money could not be taken to the open market to purchase private policies offering similar

benefits to the group policies administered by the union's trustees. The employer's cost likewise does not measure the employee's compensation because the collective bargaining agreement did not tie the employer's costs to its employees' labors. Finding that the employee's interest is "at best speculative," the Court also declined to calculate the value of the fringe benefits by reference to the employee's expectation interest in them. 461 U.S. at 631.

In considering the legislative history of the compensation act, the Court noted that fringe benefits were virtually unknown when the act was passed, but subsequently became common. Although the act has been amended several times, the Court could find no indication that Congress intended to expand the definition of wages to include fringe benefits. Significant to the Court was the fact that over the same years Congress amended the compensation act without including fringe benefits, Congress acted to include fringe benefits in other statutory schemes. *Morrison-Knudsen, supra.*

In further support of its decision to exclude fringe benefits from the wage calculation, the Court declared that a comprehensive statute such as the compensation act is not to be judicially expanded because of "recent trends" and that an expanded definition of wages would undermine the goal of providing prompt compensation to injured workers and their survivors. *Id.*

The issue before the court in *Gajan v. Bradlick Co.*, 4 Va. App. 213, 355 S.E.2d 899 (1987), was whether payments made to a third party to secure fringe benefits for an employee constitute allowances to an employee in lieu of wages. The Virginia statute defining wages for the purpose of workers' compensation provides in part that "[w]henever allowances of any character made to an employee in lieu of wages are a specified part of the wage contract, they shall be deemed a part of his earnings." Va. Code Ann. § 65.1-6 (1987).

According to the court:

> Payments to third parties made to secure fringe benefits to an employee are not payments made to an employee in lieu of wages. Fringe benefits or premiums made to secure them differ in character and purpose from direct

> payments made to employees to compensate them, directly or indirectly, for some aspect of work or to reimburse them for work related expenses.

*Gajan, supra* at 216, 355 S.E.2d at 901. The court held that health and hospitalization premiums paid by the employer for the employee were neither wages or allowances made to the employee nor payments in lieu of wages for purposes of calculating the employee's average weekly wage.

Health insurance, retirement contributions, and vacation time earned pursuant to a union contract were excluded from the compensation calculation in *Linton v. City of Great Falls*, 230 Mont. 122, 749 P.2d 55 (1988). The employee had argued that the benefits should be included because they were negotiated as part of a union contract and earned in exchange for his labor. Adopting the rationale of *Morrison-Knudsen Constr. Co. v. Director, OWCP*, 461 U.S. 624, 103 S. Ct. 2045, 76 L. Ed. 2d 194 (1983), the Montana Supreme Court held that "wages" does not include the employer's contributions to union funds that provide health or life insurance, retirement, training, vacation, pension, or disability payments.

The court in *Nelson v. SAIF*, 302 Or. 463, 731 P.2d 429 (1987), took a different approach. Ignoring the statute defining "wages" for the purpose of workers' compensation, the court instead focused on the statute creating the duty to pay compensation for temporary total disability and prescribing the formula for calculation of the amount to be paid. Under the statute, the injured employee's weekly wage is ascertained by multiplying "the daily wage the worker was receiving" at the time of injury by a figure that depends on how many days per week the employee was regularly employed. According to the court:

> The key question becomes whether claimant was "receiving" the fringe benefits as a part of his daily wage. Certainly, claimant was not receiving the funds in a literal sense. They never came into his physical possession. The money paid for medical and dental insurance was nothing more or less than premiums. The individual members of the class insured, *i.e.*, the employees, had no right *ever to receive* any part of the funds created by payment of those

premiums. Until an employee might need medical or dental care, he would not even be entitled to any benefit of the insurance created by payment of the premiums, let alone any part of the money. Until an employee became eligible, through retirement or termination, he would have no right to receive any money in the pension fund.

(Emphasis in original.) *Id.* at 469, 731 P.2d at 432. The court held that the employee was not "receiving" the money paid by the employer into the pension fund and for premiums for medical and dental insurance, and thus those amounts were not included in the daily wage the employee was receiving for the purpose of calculating the amount of compensation to which he was entitled.

In *Still v. Industrial Commission*, 27 Ariz. App. 142, 551 P.2d 591 (1976), the court held that fringe benefits were not includable in computation of the employee's average monthly wage at the time of injury. The court focused on the fact that the fringe benefits, paid by the employer directly into the union health and welfare fund and the union pension fund, were not the result of the employee's individual labors but were instead the fruits of collective bargaining efforts. The fact that the employer had no role in determining when, if ever, or to what extent any employee would benefit from the union trust funds was significant to the court. Also important to the court in reaching its decision was the fact that the benefits are not paid to the employee by the employer and thus would not be recoverable in an action at law by the employee against the employer.

Pension plan contributions, health insurance benefits, and life insurance premiums were held to not be includable in the calculation of an employee's average weekly wage in *Rainey v. Mills*, 733 S.W.2d 756 (Ky. App. 1987). Under Kentucky's workers' compensation act, "wages" includes money payments for services rendered and " 'the reasonable value of board, rent, housing, lodging, and fuel or similar advantage received from the employer, and gratuities received in the course of employment from others than the employer to the extent such gratuities are reported for income tax purposes.' " *Id.* at 758. The court found that the fringe benefits were not a "similar

advantage" to an employee as "board, rent, housing, lodging, and fuel." Therefore, given the express language of the statute and the failure of the Legislature to include fringe benefits in any amendments to the workers' compensation act, the court concluded that fringe benefits were not intended to be encompassed by the definition of "wages."

Other state courts have held that fringe benefits are to be included in wage calculations for the purpose of workers' compensation.

In *Ragland v. Morrison-Knudsen Co., Inc.*, 724 P.2d 519 (Alaska 1986), the court held that the value of vested union fringe benefits, including pension, health and welfare, legal fund, and trust benefits, paid by the employer on behalf of the employee is to be included as "wages" for the purpose of computing the employee's average weekly wage. At the time of the injury, under Alaska's workers' compensation act "wages" meant

"the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the injury, and includes the reasonable value of board, rent, housing, lodging or similar advantage received from the employer, and gratuities received in the course of employment from others than the employer."

*Id.* at 520. Rather than analyzing the fringe benefits under the "similar advantage" clause, the court analyzed them as part of "the money rate" at which an employee is paid.

The *Ragland* court found the rationale of *Morrison-Knudsen Constr. Co. v. Director, OWCP*, 461 U.S. 624, 103 S. Ct. 2045, 76 L. Ed. 2d 194 (1983), not applicable. Under the collective bargaining agreement with the union, a total hourly wage rate was negotiated by the union and the employer, and union members voted to determine how the total wage is divided between cash payments and fringe benefits. According to the court, the contribution to fringe benefits was not speculative but, rather, was tied directly to the number of hours worked by the employee. The court found: "There is no principled distinction between cash payments and payments into a fringe benefit plan. Employees may bargain to receive cash only, or may agree to forego some cash in exchange for

fringe benefits. However, their compensable earning power is the same in either case." *Ragland, supra* at 521. Believing that the total hourly wage, no matter how it is apportioned between cash payments and fringe benefits, is "the money rate at which the service rendered is recompensed," the court concluded that the readily identifiable and calculable value of fringe benefits should be included in the wage determination. See, also, *Hite v. Evart Products Co.*, 34 Mich. App. 247, 191 N.W.2d 136 (1971) (employer's contributions for pension fund and group insurance plan should have been included in determining average weekly wage).

Fringe benefits consisting of the weekly premium value of medical, hospitalization, and life insurance policies which were not provided gratuitously to the employee but, rather, were specified as part of the wage contract were held to constitute "allowances of any character" and therefore were includable in the computation of the employee's average weekly wage in *Ex parte Murray,* 490 So. 2d 1238 (Ala. 1986). The statute at issue provided in part that " '[w]hatever allowances of any character made to an employee in lieu of wages are specified as part of the wage contract shall be deemed a part of his earnings.' " *Id.* at 1240. The lower court, finding "whatever allowances" to be synonymous with "similar advantage," adopted the reasoning of *Morrison-Knudsen Constr. Co. v. Director, OWCP, supra*, and held fringe benefits to not be includable in computation of the worker's average weekly wage. On appeal, the Alabama Supreme Court found "similar advantage" and "whatever allowances" to not be synonymous.

According to the court:

> In this case the employer-paid premiums for medical, hospitalization, and life insurance coverage for the employee can be readily converted into a cash equivalent. Instead of providing the fringe benefits, International Paper could have added $10.80 to Murray's paycheck for him to provide his own fringe benefits. Thus, there is a direct relationship between the employer's contribution and the benefit eventually obtained by the worker. Finally, the *Morrison-Knudsen* Court's warning about computation disputes overlooks the likelihood that

information on the cost of fringe benefits is routinely maintained by the employer for tax purposes and can be ascertained through generally accepted accounting principles and procedures.

*Ex parte Murray, supra* at 1240.

The court in *Murphy v. Ampex Corp.*, 703 P.2d 632 (Colo. App. 1985), held that the value of expanded group health coverage and supplemental life insurance coverage provided by the employer should have been included as "wages" in determining the amount of the employee's wage loss attributable to injury. The relevant statute provides:

Whenever the term "wages" is used, it shall be construed to mean the money rate at which the services rendered are recompensed under the contract of hire in force at the time of injury, either express or implied, and shall not include gratuities received from employers or others . . . but the term "wages" shall include the reasonable value of board, rent, housing, lodging, or any other similar advantages received from the employer, the reasonable value of which shall be fixed and determined from the facts by the division in each particular case.

Colo. Rev. Stat. § 8-47-101(2) (1986). The court found that fringe benefits are advantages, often specifically bargained for, that are received by the employee, which are similar to benefits such as board and lodging and, thus, are part of the wages received by the employee.

This issue is one of first impression in Nebraska. The majority view appears to be the more practical and reasonable approach and is the position which we adopt. It seems clear from the definition of "wages" provided in § 48-126 that fringe benefits are not gratuities, nor are they "similar advantages" to board or lodging. The money paid to the union funds should not be considered part of the "money rate" just because it is specified at a per hour rate. The money is not paid to the employee and is not the result of the employee's individual labors, but is the fruit of collective bargaining.

An additional consideration is the fact that the Legislature has amended § 48-126 a few times over the years, yet has never acted to include fringe benefits in the definition of wages. On

the other hand, under Neb. Rev. Stat. § 48-1229(3) (Reissue 1988), fringe benefits are specifically listed as part of an employee's wage for the purpose of the Nebraska Wage Payment and Collection Act. We hold that under § 48-126, money amounts negotiated between the union and employers based on hours worked by union member employees, and to be paid directly to the union to cover such things as health and welfare and pensions are not to be included within the term wages, unless the money value of such advantages to the employee has been agreed upon and fixed by the employer and employee at the time of hiring. Such was not the case here.

The judgment of the compensation court is affirmed. Appellee Schlotfeld is awarded an attorney fee in this court of $2,000 to be taxed to the appellant.

AFFIRMED.