947 P.2d 875

**Joanne E. LAZARUS, Petitioner Employee,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Community Psychology Education Services, Respondent Employer,**

**State Compensation Fund, Respondent Insurance Carrier.**

**No. 2 CA–IC 96–0045.**

Court of Appeals of Arizona, Division 2, Department B.

June 12, 1997.

Review Denied Dec. 16, 1997.

302

Samet and Gage, P.C. by Dee–Dee Samet, Tucson, for Petitioner Employee.

Anita R. Valainis, Chief Counsel, The Industrial Commission of Arizona, Phoenix, for Respondent.

James F. Crane and Mark R. Christensen, State Compensation Fund, Tucson, for Respondent Employer and Respondent Insurance Carrier.

*OPINION*

PELANDER, Presiding Judge.

The issue in this case is whether a medical insurance premium an employer pays as a fringe benefit of employment should be included in calculating an injured employee's average monthly wage under the Workers' Compensation Act, A.R.S. §§ 23–901 to 23–1091 (the Act). The administrative law judge

1. The record does not indicate whether Lazarus paid for her own health insurance or medical

(ALJ) concluded it should not. For the reasons set forth below, we affirm.

*BACKGROUND*

The parties stipulated to the following facts. Petitioner Joanne Lazarus injured her wrist in July 1993, while working as a vocational counselor for Community Psychology Education Services (CPES). Following the injury, she continued to work for CPES until she quit to take a job with a school district in August 1993. Lazarus did not miss work because of the industrial injury until May 1994, when she had to stop working because she was scheduled for surgery.

During Lazarus's employment with CPES, it had paid $81.34 per month for her medical insurance under a group policy. That benefit was part of the consideration for Lazarus taking that job. She would have had to pay $162.35 per month to convert to an individual policy under the same plan. CPES would not have paid Lazarus more wages had she declined medical insurance, and it did not continue paying medical insurance premiums for her after she left that job or while she was off work for surgery in 1994.[1]

Lazarus protested the Industrial Commission's average monthly wage calculation of $1,066.99, contending that CPES's $81.34 medical insurance premium should be included in the calculation. The ALJ initially agreed, concluding that the average monthly wage should be increased to $1,148.33. CPES sought special action relief, and this court set aside the award, concluding that we could not affirm it in the absence of additional facts. *Community Psychology Education Services v. Industrial Comm'n,* 2 CA–IC 95–0010 (memorandum decision filed July 18, 1995). On remand to the Industrial Commission, the parties stipulated to additional facts. Based on the stipulated facts and the parties' legal memoranda, the ALJ set Lazarus's average monthly wage at $1,066.99 after determining that it should not include the health insurance cost. The ALJ affirmed the decision upon administrative review, and Lazarus now seeks special action relief.

costs after she left CPES or whether her new employer provided coverage.

## DISCUSSION

Compensation for injured employees is based on the "employee's average monthly wage at the time of the injury." A.R.S. § 23–1041(A). The statute defines "average monthly wage" as "the average wage paid during and over the month in which the employee is killed or injured," § 23–1041(D), and does not offer any further guidance as to what items constitute "wages."

 Arizona cases provide some further definition. "[P]ayments or benefits conferred upon an employee in return for his labor and services are includable in computing the average monthly wage, even though these payments or benefits do not on their face purport to be 'wages.'" *Moorehead v. Industrial Comm'n,* 17 Ariz.App. 96, 99, 495 P.2d 866, 869 (1972). The computation of the average monthly wage includes "anything constituting real economic gain to the claimant." *Harvey Auto Supply, Inc. v. Industrial Comm'n,* 25 Ariz.App. 274, 276, 542 P.2d 1154, 1156 (1975). *See also Scott v. Industrial Comm'n,* 122 Ariz. 169, 593 P.2d 919 (App. 1978). "[T]he emphasis in setting a worker's average monthly wage is on what the employee has actually earned for his labors." *Senor T's Restaurant v. Industrial Comm'n,* 131 Ariz. 360, 363, 641 P.2d 848, 851 (1982). *See also* 2 Arthur Larson, *The Law of Workmen's Compensation* § 60.12(a) at 10–648, 10–655 (1996) ("In computing actual earnings as the beginning point of wage-basis calculations, there should be included not only wages and salary but anything of value received as consideration for the work, as, for example, tips, bonuses, commissions and room and board, constituting real economic gain to the employee.").

Thus, Arizona courts have considered the following to be "wages" under the statute: tips received by restaurant workers (*Senor T's*) and cabdrivers (*Scott* ); corporate stock received by an employee in lieu of cash (*Harvey Auto Supply*); a 40% commission on all sales made by the employee (*Barron v. Ambort,* 64 Ariz. 209, 167 P.2d 925 (1946)); "a house, utilities, milk, butter, eggs, and meat whenever cattle were slaughtered" (*Matlock v. Industrial Comm'n,* 70 Ariz. 25, 28, 215 P.2d 612, 614 (1950)); title to mobile home trade-ins taken in lieu of salary by the general manager of a mobile home sale corporation (*Insurance Co. of North America v. Industrial Comm'n,* 116 Ariz. 21, 567 P.2d 337 (App.1977)); and a per diem allowance which was paid regardless of actual travel and which the employee could use for any purpose (*Kerr v. Industrial Comm'n,* 23 Ariz. App. 106, 530 P.2d 1139 (1975)).

 Lazarus asserts that "average monthly wage" should include the share of health insurance premiums CPES paid on her behalf because "[m]edical insurance is of economic benefit" to an employee. In *Still v. Industrial Comm'n,* 27 Ariz.App. 142, 551 P.2d 591 (1976), Division One of this court held that an employer's payments into a union health and welfare trust fund pursuant to a collective bargaining agreement were not included in the computation of an employee's average monthly wage. The court focused on the fact that "the fringe benefits in question were not the result of [the employee's] individual labors, but the fruits of the collective bargaining efforts of his union." *Id.* at 146, 551 P.2d at 595. Further, "any benefits paid to him came from the union trust funds in question and not directly from the employer." *Id.* Respondents contend that *Still* represents the majority view and is dispositive of this case. In contrast, Lazarus contends that *Still* is distinguishable and that its rationale is outdated because it fails to recognize the importance of health insurance to workers.

A majority of courts, including the United States Supreme Court, has found that an employer's medical insurance payments are not part of the average wage calculation.[2] In

---

2. *See Morrison–Knudsen Const. Co. v. Director, Office of Workers' Comp. Programs,* 461 U.S. 624, 103 S.Ct. 2045, 76 L.Ed.2d 194 (1983); *Tabor v. Levi Strauss & Co.,* 33 Ark.App. 71, 801 S.W.2d 311 (1990); *Pascarelli v. Moliterno Stone Sales, Inc.,* 44 Conn.App. 397, 689 A.2d 1132 (1997); *Pluto v. Illinois Industrial Comm'n,* 272 Ill. App.3d 722, 650 N.E.2d 631, 208 Ill.Dec. 937 (1995); *Case of Borofsky,* 411 Mass. 379, 582 N.E.2d 538 (1991); *Wengler v. Druggists Mut. Ins. Co.,* 616 S.W.2d 859 (Mo.App.1981); *Linton v. City of Great Falls,* 230 Mont. 122, 749 P.2d 55 (1988); *Schlotfeld v. Mel's Heating & Air Conditioning,* 233 Neb. 488, 445 N.W.2d 918 (1989);

*Morrison–Knudsen Const. Co. v. Director, Office of Workers' Comp. Programs,* 461 U.S. 624, 103 S.Ct. 2045, 76 L.Ed.2d 194 (1983), the issue was "whether employer contributions to union trust funds for health and welfare, pensions, and training are 'wages' for the purpose of computing compensation benefits under § 2(13) of the Longshoremen's and Harbor Workers' Compensation Act." 461 U.S. at 626, 103 S.Ct. at 2046.[3] Based on reasoning similar to that Lazarus used in this case, the circuit court had concluded that those contributions were "wages." *Hilyer v. Morrison–Knudsen Const. Co.,* 670 F.2d 208 (D.C.Cir.1981). The court found that the employer's contributions were "identifiable, calculable values received by the employees" and emphasized that the benefits had "substantial economic value to the employees" because "[i]f they were not provided at the company's expense, each employee would have to spend his or her own money to acquire them." *Id.* at 211. Finally, the court recognized the remedial purpose of the Longshoremen's Act and the obligation to construe it liberally. *Id.* at 213.

In reversing, the Supreme Court distinguished the contributions at issue from board and lodging because the latter have a present value, easily converted to a cash equivalent. 461 U.S. at 630, 103 S.Ct. at 2049. The Court acknowledged that "the remedial policies underlying the Act authorize the agency and require us to expand the meaning of the term ['wages'] to reflect modern employment practices," and recognized the economic value of such benefits to employees. *Id.* at 635, 103 S.Ct. at 2051. Nonetheless, the Court found that the statute was designed to strike a balance between employers and employees and that "[a]gainst this background, reinterpretation of the term 'wages' would significantly alter the balance achieved by Congress." *Id.* at 636, 103 S.Ct. at 2052. The "shift in the relative value of take-home pay

versus fringe benefits" had "dramatically alter[ed] the cost factors upon which employers and their insurers have relied in ordering their affairs." *Id.* Altering those expectations was a task for Congress, the Court concluded. *Id.* We find the Supreme Court's reasoning persuasive and applicable to this case.

Lazarus urges us to adopt the minority view of a few courts which have included the cost of insurance premiums in the average wage computation. *See Ex parte Murray,* 490 So.2d 1238 (Ala.1986); *State Compensation Ins. Auth. v. Smith,* 768 P.2d 1256 (Colo. App.1988); *Mobley v. Winter Park Mem. Hosp.,* 471 So.2d 591 (Fla.App.1985); *Slack v. Thies Dev. Corp.,* 11 Kan.App.2d 204, 718 P.2d 310 (1986); *Ciampi v. Hannaford Bros. Co.,* 681 A.2d 4 (Me.1996). Most of those cases are distinguishable, however, based on the broader language of the state statutes involved. For example, in *Slack,* the Kansas statute defined "wage" as "the total of the money and any additional compensation which the employee receives for services rendered for the employer" and further defined "additional compensation" to include "employer paid ... health and accident insurance." 11 Kan.App.2d at 207, 718 P.2d at 312. Similarly, the Maine statute construed in *Ciampi* now provides that "average weekly wage" includes "[a]ny fringe or other benefit paid by the employer that does not continue during the disability." Me.Rev.Stat. Ann. tit. 39–A, § 102(4)(H). *Compare Clark v. Rust Eng. Co.,* 595 A.2d 416 (Me.1991).

The Arizona statute is narrower and less susceptible to such a broad interpretation. In *Senor T's,* our supreme court found that § 23–1041(D) was ambiguous as to "whether tips are to be included or excluded from the definition of 'monthly wage.'" 131 Ariz. at 362, 641 P.2d at 850. Construing the statute liberally in light of its purposes, the court concluded that "tips should be included in the

---

*Antillon v. New Mexico State Highway Dept.,* 113 N.M. 2, 820 P.2d 436 (App.1991); *Lucier v. North Dakota Workers Compensation Bureau,* 556 N.W.2d 56 (N.D.1996); *Nelson v. SAIF Corp.,* 302 Or. 463, 731 P.2d 429 (1987); *Pollard v. Knox County,* 886 S.W.2d 759 (Tenn.1994); *Gajan v. Bradlick Co.,* 4 Va.App. 213, 355 S.E.2d 899 (1987). *See also* Larson, *supra,* § 60–12(b).

3. That statute defined "wages" as "the money rate at which the service rendered is recompensed ... including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer, and gratuities received in the course of employment from others than the employer." *Id.* at 629, 103 S.Ct. at 2048.

compensation of the average monthly wage for purposes of determining the injured claimant's compensation." *Id.* at 364, 641 P.2d at 852.

In our view, however, employer-paid health insurance premiums are distinguishable from tips, board, lodging, and other forms of compensation which Arizona courts have previously found to come within the term "wages." "Fringe benefits or premiums made to secure them differ in character and purpose from direct payments made to employees to compensate them, directly or indirectly, for some aspect of work or to reimburse them for work related expenses." *Gajan,* 4 Va.App. at 216, 355 S.E.2d at 901. Although employees benefit from employer-paid medical coverage, which may influence an employee's decision whether to accept a particular job, the employer's premium payments do not constitute "real economic gain" in the same way that tips do.

In *Senor T's,* the court emphasized that it was "a matter of common knowledge" that waiters and waitresses "receive a substantial portion of their earnings in the form of tips." 131 Ariz. at 363, 641 P.2d at 851. Employers pay a low hourly rate, below the federal minimum wage, because both employers and employees "contemplate that tips will constitute part of the compensation under the contract of employment." *Id.* Similarly, employers might pay a domestic employee a lower cash salary but provide room and board as an additional form of compensation. Payment of health insurance premiums is not comparable. As the parties stipulated in this case, for example, CPES would not have paid Lazarus a higher wage had she declined health insurance.

Practical considerations also militate against including an employer's group health insurance premiums in calculating an employee's average monthly wage. As respondents note, "the premium was paid not to [Lazarus] but rather to a third party insurance carrier, she may never have realized any actual benefit from the insurance obtained by the payment of premiums, the amount of any actual benefit she may have realized is purely speculative as of the time of the computation of her average monthly wage, and the actual economic relationship between the benefit obtained and her individual efforts is similarly speculative." In addition, calculations of average wage for employees who opt not to receive medical insurance coverage through the employer or who, like Lazarus, leave one job to take another would be problematic. Finally, as we stated in our prior decision in this case, including the employer's premium payment in the average wage computation without knowing whether Lazarus "either purchased substitute health insurance or paid medical costs which would otherwise have been covered by the insurance ... could well result in ... the employee receiving a windfall."

█ We recognize that we must construe the Act in view of its purpose "to compensate an employee for lost earning capacity and to prevent the injured employee and his dependents from becoming public charges during the period of disability." *Senor T's,* 131 Ariz. at 363, 641 P.2d at 851. We are also aware, as Lazarus argues, that in light of rising health care and insurance costs, benefits such as these are increasingly important to employees. For this very reason, however, expanding the definition of "average monthly wage" to include such benefits represents a significant change that should be made by the legislature.[4] Although courts should interpret statutes in view of their purpose as well as " 'in light of subsequent events,' " *Aitken v. Industrial Comm'n,* 183 Ariz. 387, 391, 904 P.2d 456, 460 (1995), *quoting Idaho v. Hodel,* 814 F.2d 1288, 1298 (9th Cir.1987), "the judiciary is not the proper branch of government to update complex statutes when legislative decisionmaking is necessary." *West Winds, Inc. v. M.V. Resolute,* 720 F.2d 1097, 1102 (9th Cir.1983) (contributions to union trust funds were not "wages of the crew" under the Ship Mortgage Act, 46 U.S.C. § 953).

---

4. Several states have enacted statutes expressly providing for the inclusion of fringe benefits in the calculation of an average wage. *See* Ala. Code § 25–5–1(6); Colo.Rev.Stat.Ann. § 40–201; Fla.Stat.Ann. § 440.02(24); Kan.Stat.Ann. § 44–511(a)(2); Me.Rev.Stat.Ann. tit. 39–A, § 102(4)(H); Mich.Comp.Laws § 418.371(2).

## CONCLUSION

For the foregoing reasons, we adopt the majority view and hold that, absent clear statutory authority, the cost of health insurance premiums paid by an employer should not be included in calculating average monthly wage. Therefore, we affirm the award.

ESPINOSA and HOWARD, JJ., concur.