2013 VT 44

# Deborah Lydy v. Trustaff, Inc./Wausau Insurance Company

[76 A.3d 150]

No. 12-081

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed June 28, 2013

Motion for Reargument Denied July 30, 2013

*Christopher McVeigh* of *McVeigh* ♦ *Skiff*, Burlington, for Plaintiff-Appellant.

*Jeffrey T. Dickson* and *Keith J. Kasper* of *McCormick, Fitzpatrick, Kasper & Burchard, P.C.*, Burlington, for Defendant-Appellee.

¶ 1. **Skoglund, J.** The issue in this case is whether employer-paid health insurance premiums must be included when calculating an injured employee's average weekly wage under the Vermont Workers' Compensation Act.[1] The Commissioner of the

---

[1] The question certified to this Court was: "Should Defendant's contribution to Claimant's group health insurance premium be included in her average weekly wage and compensation rate calculation?" In this case, claimant was working for a subsequent employer at the time of her successive period of disability, and the

Department of Labor (DOL) concluded that such premiums are not "wages" as defined under the Act and therefore should not be included. We affirm.

¶ 2. The underlying facts of this case are undisputed. Claimant is a ·licensed practical nurse who was employed by defendant, Trustaff, Inc., as a traveling nurse and was temporarily stationed in a Rutland, Vermont nursing home. While on duty, a patient attacked claimant, causing her to suffer, among other things, an acute cervical sprain. Defendant accepted responsibility for the physical injuries sustained by claimant, finding them compensable under workers' compensation. Three days after the injury, claimant returned to work but was restricted to desk duty. Unfortunately, defendant had no available desk jobs. Claimant left defendant's employ shortly thereafter and moved to Arizona, where she obtained employment at a long-term care facility. Claimant worked in various capacities at the facility until November 2009 when her treating physician recommended that she stop working on account of her cervical injury. At that point, defendant began paying claimant temporary total disability benefits under Vermont Workers' Compensation Act. See 21 V.S.A. § 650. When ·calculating claimant's average weekly wage pursuant to § 650, defendant did not include the employer-paid health insurance premiums paid by claimant's new employer.

¶ 3. Based on previous administrative interpretations of the statute,[2] the Commissioner concluded that employer-provided health insurance premiums are not part of an employee's wages and therefore are not part of the claimant's average weekly wage computation. She rejected the inclusion of these benefits in the average weekly wage, citing a prior DOL decision that held this would "dramatically impact the delicate balance that the workers' compensation act seeks to maintain between employers and em-

---

question as we understand it is whether that subsequent employer's contributions to her health care premium should be included in the calculation of her new average weekly wage. 21 V.S.A. § 650(c).

[2] For over twenty years, the Commissioner has denied requests to incorporate employer-paid health insurance premiums into the worker's average weekly wage calculation. See Workers' Compensation Hearing Decisions: *Pelissier v. Hannaford Bros.*, No. 26-11WC (Sep. 9, 2011), http://www.labor.vt.gov/portals/0/WC/PelissierDecision.pdf; *T.K. v. Green Mountain Steel Erectors*, No. 29-08WC (July 3, 2008), http://labor.vermont.gov/portals/0/WC/KirbyDecisionPP.pdf; *Pickens v. NSA Indus.*, No 36-98WC (June 24, 1998); *Antilla v. Edlund Co.*, No. 7-90WC (May 22, 1990).

ployees." See *Pelissier v. Hannaford Bros.*, No. 26-11WC, ¶ 14 (Sep. 9, 2011) (internal citations omitted). Based on the *Pelissier* decision, the Commissioner also concluded that the interpretation was not appropriate for alteration by administrative fiat and that any such change was better left for the Legislature. This appeal followed.

■ ¶ 4. While we review questions of law de novo, "the Commissioner has been entrusted by the Legislature with the administration of the workers' compensation program," and we accord "substantial deference to her initial interpretation and application" of the workers' compensation statutes. *Letourneau v. A.N. Deringer/Wausau Ins. Co.*, 2008 VT 106, ¶ 8, 184 Vt. 422, 966 A.2d 133. Therefore, while we require the proper interpretation of the law, "we will defer to the Commissioner's construction of the Workers' Compensation Act, absent a compelling indication of error." *Morin v. Essex Optical/The Hartford*, 2005 VT 15, ¶ 4, 178 Vt. 29, 868 A.2d 729 (quotation omitted).

■ ¶ 5. Our examination of the Commissioner's interpretation of the statute begins with the plain language of the Act. An injured worker's weekly compensation is based on the claimant's average weekly wage. 21 V.S.A. § 650. Wages, as defined in the Act, include "bonuses and the market value of board, lodging, fuel and other advantages which can be estimated in money and which the employee receives from the employer as a part of his or her remuneration." *Id.* § 601(13). The question here is whether the Legislature intended the phrase "other advantages" to include employer-paid health insurance premiums.

¶ 6. When construing statutes, our primary goal is to give effect to the Legislature's intent. *Gallipo v. City of Rutland*, 173 Vt. 223, 235, 789 A.2d 942, 952 (2001). If the meaning of a statute is plain on its face, it must be enforced accordingly; if, however, the statute is ambiguous and capable of more than one reasonable interpretation, the legislative intent "should be gathered from a consideration of the whole and every part of the statute, the subject matter, the effects and consequences, and the reason and spirit of the law." *Langrock v. Dep't of Taxes*, 139 Vt. 108, 110, 423 A.2d 838, 839 (1980) (quotation omitted).

■ ¶ 7. The definition of "wages" does not mention employer-paid health insurance premiums. While one can presumably determine the market value of board or lodging or fuel, the phrase

"other advantages which can be estimated in money" is ambiguous and capable of more than one reasonable interpretation. Thus, the plain and ordinary meaning of the phrase does not resolve the question presented. In fact, the phrase "other advantages" could cover countless other costs paid by the employer, including payments to third parties for the benefit of the employee, such as employer-paid life insurance premiums, pension packages or 401(k) contributions, employer-based social security contributions, and other fringe benefits. Because the phrase "other advantages" yields more than one reasonable interpretation, we attempt to discern the Legislature's intent by other means and look to legislative history. See *In re Margaret Susan P.*, 169 Vt. 252, 262, 733 A.2d 38, 46 (1999) (stating that when "the language is unclear and ambiguous, legislative history may be used to determine the intent of the Legislature").

¶ 8. As part of a nationwide movement to provide adequate remedies for the growing number of injured industrial workers, states began enacting workers' compensation laws "to dispense with the concept of negligence" by providing compensation, by means of medical coverage or income replacement benefits, "to any employee who is injured on the job and to limit employers' exposure to lawsuits for negligence in the workplace." 1 A. Larson & L. Larson, Larson's Workers' Compensation Law §§ 2.07-2.08 (2012); see also 2007, No. 208 (Adj. Sess.), § 1(a)(1). Though there was little uniformity among the various acts in the early 1900s, most laws compensated employees for the core, nonfringe benefits of housing, food, and fuel.

¶ 9. Vermont followed suit. Vermont's Workers' Compensation Act emerged in 1915 when Vermont's economy depended on a large labor workforce and it was common for employers to provide lodging for those who toiled in the granite quarries, marble fields, and textile mills, among other industries. "Poor conditions for workers . . . attracted the concern of several civic-minded groups," including the Vermont Federation of Women's Clubs, who began rallying against the "many evil conditions prevalent in the state." See M. Sherman, et al., *Freedom and Unity: A History of Vermont* 368 (2004). As part of the worker-protection momentum, the Legislature enacted the workers' compensation law, which provided payments to widows and children of men killed in industrial accidents and payment of medical and hospital costs to employees injured on the job. *Id.*

 ¶ 10. The definition of wage for determining a temporarily disabled employee's average weekly wage has remained unaltered since the Act's inception in 1915 with the exception of adding the term "bonuses." See 1915, No. 164, § 58(h). Health insurance, as it exists today, did not develop until the late 1920s, when a group of school teachers began to make small monthly payments to a hospital for future medical care. See S. Cancelosi, *Revisiting Employer Prescription Drug Plans for Medicare-Eligible Retirees in the Medicare Part D Era*, 6 Houston J. Health L. & Pol'y 85, 87 (2005). Before that time, individuals paid medical expenses out of pocket, placing both the scheme of health insurance and its future connection to the workplace well beyond the scope of even the most forward-thinking Legislature to consider when defining "wages" in 1915.

¶ 11. Even though there were some industries, such as lumber and railroad, that provided accident coverage to their workers early on, employer-paid health insurance did not become commonplace until World War II when labor was in high demand and employers were looking for ways to attract workers without going over the federally imposed wage cap. *Id.* For purposes of the wage cap, health insurance was not defined as a wage. *Id.* at 88. Because the health-insurance system was not in place when the Legislature defined wages in 1915, and because the Legislature has not amended the definition to include employer-paid health insurance after it developed into a customary benefit, it is prudent to conclude that such a benefit was not intended to be part of an employee's average weekly wage.

 ¶ 12. In fact, the expanded interpretation urged by claimant ignores the remainder of the statutory phrase, which limits "other advantages" to those "which the employee receives from the employer as a part of his or her remuneration." To remunerate is to "pay (a person) for goods provided, services rendered, or losses incurred"; remuneration is a "payment." The American Heritage Dictionary 1101 (New College ed. 1979). An employee is not paid for her work with health insurance; rather, health insurance is a fringe benefit of employment. The definition of wages implies a payment actually received by an employee — it more closely refers to the actual earnings of the worker. See 21 V.S.A. § 650(a) ("Average weekly wages shall be computed in such manner as is best calculated to give the average weekly earnings of the worker . . . .").

¶ 13. Claimant's argument conflates employers' costs with employees' remuneration. The U.S. Supreme Court has rejected this approach. In *Morrison-Knudsen Construction Co. v. Director, Office of Workers' Compensation Programs*, 461 U.S. 624, 630 (1983), the Court held that an employer's contributions to union trust funds required under the terms of the collective bargaining agreement did not qualify as a "similar advantage" under the Longshore and Harbor Workers' Compensation Act,[3] the federal counterpart to state workers' compensation laws. The Supreme Court narrowed the question before it to whether the employer's contributions were a "similar advantage" to "board, rent, housing [or] lodging" and found they were not. *Id.* And, while the claimant in that case urged the Court to calculate the present value of the trust funds by using the employer's cost of maintaining these funds, the Court stated, "The employer's cost is irrelevant in this context; it measures neither the employee's benefit nor his compensation." *Id.* Finally, the Court refused to attempt to value the funds by the employee's expectation interest in them, "for that interest is at best speculative." *Id.* at 631. Though the funds were intended for the benefit of the worker, as a means by which the company provided life insurance, health insurance, retirement benefits and career training for the employees, they were not, according to the Court, a part of the employee's wages. *Id.* at 630-32.

¶ 14. The same can be said of Vermont's workers' compensation law. The employer's cost in providing health insurance measures neither the employee's benefit nor his compensation. Employer health insurance rates are based on the plans offered, which can vary tremendously. The costs are not tied to the employee's labors and instead are based on factors unconnected to the employee. The existence of the insurance and the calculation of the employer's contribution to it does not equate to a measurement of the benefit to the employee. While the employer may contribute a set figure for the coverage, the employee may enjoy medical services that far exceed the cost to the employer or, if

---

[3] The statute defined "wages" as "the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the injury, including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer, and gratuities received in the course of employment from others than the employer." See *id.* at 629.

lucky in health, the employee may never gain any tangible benefit from the coverage. As such, we find that the employer's contribution for health insurance, though determinable, does not accurately reflect the employee's labors or compensation as defined through wages.

¶ 15. Claimant challenges the relevance of the *Morrison-Knudsen* decision and attempts to distinguish her case from the federal counterpart based on a slight difference in language between the Longshore Act and the language of Vermont's Workers' Compensation Act. Where Vermont's Act defines wages to include "board, lodging, fuel and other advantages," 21 V.S.A. § 601(13), the Longshore Act includes "board, rent, housing, lodging and similar advantages." 33 U.S.C. § 902.[4] Claimant contends that the modifier "other" is more expansive than "similar," which she contends restricts "advantages" to those like the preceding list of items; claimant maintains that "other advantages" are not so narrowly constricted, but rather are limited only by whether they can be "estimated in money."

¶ 16. We appreciate the distinction and agree that the term "similar" is more restrictive than "other"; nevertheless, the Court's rationale in *Morrison-Knudsen* remains cogent and serves as a helpful tool in analyzing legislative intent. In *Morrison-Knudsen*, the Court consulted the statute's legislative history and found no evidence indicating that Congress intended wages to include employer contributions to benefit plans. See 461 U.S. at 632-33. Similarly, the Court recognized that while fringe benefits had become a common feature in American workplaces, their lack of inclusion in the original and amended enactments of the Longshore Act illustrated Congress's intent to exclude these benefits from the Act's wage definition. *Id.* The Court wrote, "a comprehensive statute such as this Act is not to be judicially expanded because of 'recent trends.' " *Id.* at 635. It further acknowledged that the Act

> was not a simple remedial statute intended for the benefit of the workers. Rather, it was designed to strike

---

[4] The statute was amended in 1998 to expressly exclude fringe benefits, such as, "employer payments for or contributions to a retirement, pension, health and welfare, life insurance, training, social security or other employee or dependent benefit plan for the employee's or dependent's benefit, or any other employee's dependent entitlement" from the definition of "wages." Pub. L. No. 98-426, § 2(c) (1998).

a balance between the concerns of the longshoremen and harbor workers on the one hand, and their employers on the other. . . .

Against this background, reinterpretation of the term "wages" would significantly alter the balance achieved by Congress.

*Id.* at 636. The Court also relied on the Department of Labor's prior determinations that excluded fringe benefits from wages. *Id.* at 635. We find the Court's rationale in *Morrison-Knudsen* persuasive.

■ ■ ¶ 17. Both claimant and employer look to other states to resolve this issue. We are reluctant to rely too heavily on these narrow imports from other jurisdictions because of the variety of statutory schemes and purposes. See *State v. Deyo*, 2006 VT 120, ¶ 23 n.5, 181 Vt. 89, 915 A.2d 249 (stating that courts should use caution when consulting other statutory schemes to interpret our own, unique laws). There is a split of authority with respect to whether fringe benefits are wages for the purpose of workers' compensation. States, such as Arizona, have excluded fringe benefits from wage calculations, concluding that employer premium payments do not constitute "real economic gain" in the same way that tips, board, or lodging do. *Lazarus v. Indus. Comm'n of Ariz.*, 947 P.2d 875, 879 (Ariz. Ct. App. 1997). Other states, such as Washington, have interpreted their statutes to include health insurance, reasoning that it is a core, nonfringe benefit — critical to protecting workers' "basic health and survival." See *Cockle v. Dep't of Labor & Indus.*, 16 P.3d 583, 594 (Wash. 2001); see also *Ex parte Murray*, 490 So. 2d 1238 (Ala. 1986). Alternatively, many states have left the matter to the legislature. See *Groover v. Johnson Controls World Serv.*, 527 S.E.2d 639, 641-42 (Ga. Ct. App. 2000) (allowing a $30 shoe stipend but rejecting inclusion of employer's contributions toward health plan); *Gajan v. Bradlick Co.*, 355 S.E.2d 899, 902 (Va. Ct. App. 1987) (specifically negotiated increase of employer's percentage of insurance premiums not considered part of wages). Given the array of statutory language interpreted in these cases, it is unsurprising they have reached divergent results. In light of this variety, and against the backdrop of Vermont Department of Labor's consistent interpretation of our own statute, we do not find other states' decisions compelling.

174

¶ 18. In view of the statutory language taken as whole, we find that the Commissioner's twenty-year interpretation and application of the statute does not present a "compelling indication of error." The Commissioner concluded that allowing employer-paid health insurance benefits to be included in the average weekly wage calculation would upset the "delicate balance" that the law seeks to maintain. She is correct. In 1985, the Colorado Court of Appeals interpreted its statute to include health insurance, reasoning that health and life insurance have significant value that cannot be excluded as part of the wages received by the employee. See *Murphy v. Ampex Corp.*, 703 P.2d 632, 633-34 (Colo. App. 1985). Following the court's lead, the Colorado legislature adopted a statute that expressly included health insurance premiums as part of the wage calculation; however, it offset any potential windfall to the claimant by eliminating other fringe benefits. See Colo. Rev. Stat. § 8-40-201(19)(b); see also *Humane Soc'y of Pikes Peak Region v. Indus. Claim Appeals Office*, 26 P.3d 546, 549 (Colo. App. 2001).

¶ 19. Unlike the Colorado Court of Appeals, this Court will not judicially legislate what would amount to a large increase in compensation costs. Well aware of the delicate balancing involved in workers' compensation, had the Legislature intended wages to include payments made to third parties on behalf of employees for the purpose of acquiring health insurance, it could have so stated. See 2007, No. 208 (Adj. Sess.), § 1(a)(5) (finding that "[d]espite recent stability in workers' compensation rates, the comparatively high cost of workers' compensation insurance in Vermont remains an issue of great concern to many Vermont employers"). While the workers' compensation law is to be construed liberally to accomplish the humane purpose for which it was passed, we must also remember that the law serves the dual purposes of providing an expeditious remedy for injured employees independent of proof of fault, and of offering employers a liability which is limited and determinate. *Quinn v. Pate*, 124 Vt. 121, 197 A.2d 795 (1964). If the definition of average weekly wage is to be expanded to include such value, it is a question for the Legislature, and one that requires robust legislative debate, affording various constituencies a voice in the matter. It is not a matter for the judiciary. Accordingly, the judgment of the Commissioner is affirmed.

*Affirmed.*

¶ 20. **Robinson, J.,** dissenting. This is a tough case. In my view, it pits a longstanding· agency interpretation — never court-tested, but by now woven into the fabric of our workers' compensation system — against a clear legislative directive reflected in the applicable statute. A ruling in either direction must stray from an important core principle — deference to the agency charged with administering our workers' compensation laws on the one hand, and fealty to the will of the Legislature, as reflected in the language and purposes of the Workers' Compensation Act on the other.

¶ 21. Like the majority, I believe that the question of whether health insurance premiums paid by employers fall within the broad definition of "wages" in 21 V.S.A. § 601(13) is squarely one for the Legislature. Our task is to consider the statute the Legislature has passed, with appropriate deference to the Department of Labor, in an effort to discern how the Legislature has directed us to answer the question. Given the plain language of the statute, as well as the purposes underlying the law, I cannot conclude that the Legislature intended to exclude such a critical component of many employees' total compensation from the calculation of average weekly wage.

I.

¶ 22. "Our paramount goal in interpreting a statute is to give effect to the Legislature's intent." *State v. Deyo,* 2006 VT 120, ¶ 14, 181 Vt. 89, 915 A.2d 249. We traditionally afford deference to the Commissioner's interpretation of the workers' compensation statute, affirming the Commissioner's construction absent a compelling indication of error. *Wood v. Fletcher Allen Health Care,* 169 Vt. 419, 422, 739 A.2d 1201, 1204 (1999). However, this deference is not unlimited, and "we will not affirm an interpretation that is unjust or unreasonable," *Clodgo v. Rentavision, Inc.,* 166 Vt. 548, 550, 701 A.2d 1044, 1045 (1997); see also *Morin v. Essex Optical/The Hartford,* 2005 VT 15, ¶ 4, 178 Vt. 29, 868 A.2d 729, or that undermines the regulatory purpose of the statute, see *In re Williston Inn Grp.,* 2008 VT 47, ¶ 19, 183 Vt. 621, 949 A.2d 1073 (mem.).

¶ 23. Moreover, we have recognized that "our workers' compensation statute is 'remedial in nature and must be liberally construed to provide injured employees with benefits unless the law is clear to the contrary.' " *Murray v. Luzenac Corp.,* 2003 VT

37, ¶ 4, 175 Vt. 529, 830 A.2d 1 (mem.) (quoting *St. Paul Fire & Marine Ins. Co. v. Surdam*, 156 Vt. 585, 590, 595 A.2d 264, 266 (1991)). Our general practice of affirming an agency's construction of a statute unless it is clearly wrong, and the specific precept that we construe the workers' compensation laws liberally to afford benefits unless the law clearly provides otherwise, are in tension in this case. Ultimately, although the Commissioner enjoys a thumb on the scale as we weigh competing interpretations of the statute, and although we are mindful of the remedial purposes of the workers' compensation laws generally, our overriding responsibility is to give effect to the Legislature's intent. *Deyo*, 2006 VT 120, ¶ 14.

¶ 24. Vermont's workers' compensation law reflects a trade-off pursuant to which injured workers forfeit their common-law right to sue employers for negligence and the damages associated therewith, but are entitled to a remedy for work injuries independent of fault; employers, on the other hand, are shielded from liability for tort damages and instead face a limited and determinate liability. See 21 V.S.A. § 622 (right to compensation exclusive); *In re Chatham Woods Holdings, LLC*, 2008 VT 70, ¶ 9, 184 Vt. 163, 955 A.2d 1183.

¶ 25. Within this broader scheme, we have recognized that one of the purposes of the law is to protect against an injured worker's loss of earning capacity. See *Bishop v. Town of Barre*, 140 Vt. 564, 572, 442 A.2d 50, 53 (1982) ("The claimant correctly assigns protection against wage loss as one of the Act's purposes."). Even in the case of permanent disability benefits, which are awarded on the basis of schedules rather than individual future wage loss, we have acknowledged that a goal of the system is to compensate for likely future lost earning capacity:

> "[Exclusion of individual wage loss evidence] is not . . . to be interpreted as an erratic deviation from the underlying principle of compensation law — that benefits relate to loss of earning capacity and not to physical injury as such. The basic theory remains the same; the only difference is that the effect on earning capacity is a conclusively presumed one, instead of a specifically proved one based on the individual's actual wage-loss experience."

*Id.* at 572-73, 442 A.2d at 53-54 (quoting 2 A. Larson, Workmen's Compensation Law § 58.11, at 10-173 to -174 (1981)).

¶ 26. Proper calculation of an injured worker's predisability "average weekly wages" is critical to achieving this goal because temporary total and temporary partial disability benefits and permanent partial disability benefits are calculated with reference to a worker's average weekly wage. See 21 V.S.A. § 642 (subject to statutory minimum and maximum and adjustment for dependents, temporary total disability benefit is two-thirds of average weekly wage); *id.* § 646 (temporary partial disability benefits are calculated as two-thirds of difference between worker's average weekly wage and average weekly wage injured worker is able to earn after injury); *id.* §§ 645, 648(a) (subject to maximum and minimum, weekly permanent partial and permanent total disability benefits are two-thirds of average weekly wage). Pursuant to the Department of Labor's rules, the extent of a claimant's entitlement to vocational rehabilitation services to restore earning power is also tied to the injured worker's average weekly wage. Workers' Compensation Vocational Rehabilitation Rules §§ 51.2600, 51.2700, 53.0000, 3 Code of Vt. Rules 24 010 012-2 to -4, available at http://www.lexisnexis.com/hottopics/codeofvtrules. Thus, consistent with the goal of targeting loss of earning capacity, subject to a floor and a ceiling, the workers' compensation scheme provides for benefits to workers in proportion to their preinjury average weekly wage; injured workers who had higher preinjury earnings are entitled to higher benefits than those who had lower preinjury earnings.

¶ 27. The provision defining "average weekly wages" also reinforces the earnings-protection purposes of the workers' compensation laws. 21 V.S.A. § 650. Generally, an injured worker's average weekly wage is calculated based on the average of that worker's earnings during the twenty-six weeks preceding the injury. *Id.* However, periods of sickness or suspension of work during that period don't count; if a worker got a raise or other change leading to regular larger wages during that period, the prior period of lower earnings doesn't count; and concurrent wages from other insured employers count in the calculation of average weekly wage. *Id.* The statute thus ensures that the average weekly wage calculation reflects as closely as possible the worker's actual earning power at the time of injury, without distortions caused by sickness, recent raises, or the fact that a worker has multiple jobs.

¶ 28. The specific provision at issue here — the statutory definition of "wages" — must be understood in the context of this

broader statutory scheme and the goals it promotes. *State v. Jarvis*, 146 Vt. 636, 637, 509 A.2d 1005, 1006 (1986) (in determining legislative intent, we "must examine and consider fairly, not just isolated sentences or phrases, but the whole and every part of the statute") (quotation omitted)).

## II.

¶ 29. "Wages" is defined in the workers' compensation statute as follows:

> "Wages" includes bonuses and the market value of board, lodging, fuel and other advantages which can be estimated in money and which the employee receives from the employer as a part of his or her remuneration; but does not include any sum paid by the employer to his or her employee to cover any special expenses entailed on the employee by the nature of his or her employment.

21 V.S.A. § 601(13).

¶ 30. At issue in this case is whether this broad definition of wages includes employer-provided (or subsidized) health insurance. I start with the plain language of the statute. *In re Porter*, 2012 VT 97, ¶ 10, 192 Vt. 601, 70 A.3d 915 ("We first look to the plain language of the statute. If the meaning is clear, we enforce the statute according to its terms without resort to statutory construction."). In this case, the plain language is fully congruent with the underlying purposes of the statute described above, so I consider the language and purposes of the statute in tandem. *Merkel v. Nationwide Ins. Co.*, 166 Vt. 311, 314, 693 A.2d 706, 707-08 (1997) (reciting that in construing a statute, "[w]e consider the purpose of the statute and look to the broad subject matter of the law, its effects and consequences, and the reason and spirit of the law." (quotation omitted)). The question is: in light of the language and purposes of the workers' compensation statute, is health insurance an "other advantage" which can be estimated in money, and which the employee receives from the employer as a part of his or her remuneration?

¶ 31. The broad reference to "other advantages" an employee receives from the employer suggests a legislative intent to cast a wide net, consistent with its goal of protecting earning capacity. We have previously recognized that, although the term "wages" ordinarily implies "compensation in money," the term, as used in

Vermont's workers' compensation statute, "is synonymous with 'earnings,' " and includes "material objects or benefits other than cash." *Quinn v. Pate,* 124 Vt. 121, 124, 197 A.2d 795, 797 (1964); see also 2 A. Larson & L. Larson, Larson's Workers' Compensation Law § 93.01[2][a] (2012) ("In computing actual earnings as the beginning point of wage-basis calculations, there should be included not only wages and salary but any thing of value received as consideration for the work, as, for example, tips, bonuses, commissions and room and board, constituting real economic gain to the employee.").

¶ 32. There can be little doubt that health insurance is an "advantage" received by employees as part of their remuneration. Most workers — 56% — have health insurance through an employer plan. Henry J. Kaiser Family Found. & Health Research & Educ. Trust, *Employer Health Benefits: 2012 Annual Survey* 50, http://kaiserfamilyfoundation.files.wordpress.com/2013/03/8345-employer-health-benefits-annual-survey-full-report-0912.pdf [hereinafter Kaiser Foundation Survey]. The fact that 81% of workers who are eligible to participate in an employer's plan choose to do so reflects the importance of health insurance to the American worker. *Id.* at 51. In 2012, employers contributed an average of $4664 for single coverage and $11,429 for family coverage, not counting employer contributions to Health Savings Accounts. *Id.* at 76, 77. The Bureau of Labor Statistics reports that, in December 2012, health insurance accounted for 8.5% of workers' total compensation — a greater percentage than paid leave (7%) and supplemental pay such as overtime, bonuses, or shift differentials (2.4%). Bureau of Labor Statistics, U.S. Dep't of Labor, *Employer Costs for Employee Compensation — December 2012*, Table A (Mar. 12, 2013), http://www.bls.gov/news.release/archives/ecec_03122013.htm. Given the centrality of health insurance as a valuable and substantial component of most workers' total compensation, I cannot conclude that it is not among the "other advantages" included within the definition of wages.

¶ 33. Employer argues that the term "other advantages" should be understood in the context of the preceding list of benefits — board, lodging and fuel — and that viewed in that light, health insurance is not among the "other advantages" identified by the statute. The majority relies on a U.S. Supreme Court decision that held that an employer's contribution to a union health and welfare fund that provided benefits to workers was not a "similar

advantage" to board, rent, housing, or lodging for purposes of the federal Longshore and Harbor Workers' Compensation Act (LHWCA). *Morrison-Knudsen Constr. Co. v. Dir., Office of Workers' Comp. Programs*, 461 U.S. 624 (1983). The circumstances in *Morrison-Knudsen* are distinguishable from this case; more importantly, the majority opinion in that case is less persuasive than Justice Marshall's dissent.

¶ 34. First, the distinctions. The LHWCA at the time defined wages to include " 'the reasonable value of board, rent, housing, lodging, or *similar* advantage received from the employer.' " *Morrison-Knudsen*, 461 U.S. at 629 (quoting LHWCA) (emphasis added). "Wages" in our statute includes "other advantages" received from the employer, without a restriction that those advantages be "similar" to the preceding list. I presume the Legislature chose its terms advisedly; had it intended to limit the "advantages" of employment included in the wage calculation to those that are similar to board, lodging, and fuel, it could have done so. See *Robes v. Town of Hartford*, 161 Vt. 187, 193, 636 A.2d 342, 347 (1993) ("[W]e presume that the legislature chose its words advisedly. If the legislature had intended the payment of 'current expenses,' then it would have used the more specific term rather than the general term 'expenses.' " (citation omitted)).

¶ 35. Second, the benefit at issue in *Morrison-Knudsen* was different from the health insurance premium in this case in significant ways. In *Morrison-Knudsen*, pursuant to a collective bargaining agreement, the employer paid a fixed sum for every hour of work to union trust funds for health and welfare, training, and pensions. 461 U.S. at 627 n.3. The Court did not suggest that these contributions were not significant advantages to the worker, but concluded that the value of the injured worker's interests in the funds to which the employer contributed on his behalf was too nebulous to consider in the calculation of his base wage. *Id.* at 630-32. Notwithstanding the per-hour contributions by the employer, workers were entitled to actual pension benefits funded by the pension trust fund only if they met certain requirements, and only after vesting; the value of the training fund that had been established by the union was "even more amorphous"; and the value to the injured worker of the health and welfare fund — which covered everything from medical benefits to unemployment benefits to compensation for injuries to the purchase of health insurance — was not ascertainable. *Id.* The Court emphasized that

the worker could not have, on the open market, purchased insurance policies similar to the funds administered by the union for the sums contributed by the employer to those funds. *Id.* at 630. The Court's analysis in *Morrison-Knudsen*, as applied to the question before us pursuant to Vermont's statute, did not undermine the notion that health insurance is an advantage but, rather, focused on the question of whether it could be "estimated in money." 21 V.S.A. § 601(13).

¶ 36. The benefit at issue in this case — health insurance coverage provided by the employer — is not nebulous in the way that the worker's interest in the various union trust funds was in *Morrison-Knudsen*. Whereas health insurance was just one component of a broad array of benefits encompassed by the union health and welfare fund in *Morrison-Knudsen*, 461 U.S. at 627 n.3, the focus in this case is on health insurance by itself. Health insurance premiums are a fixed sum paid by an employer, either exclusively or with contributions from the worker, that purchase a defined product on the insurance market, or through a regulated self-insurance plan resting on similar actuarial assumptions. A health insurance market drives the cost of premiums, and the cost of a particular plan of coverage is directly related to the scope of coverage available under that plan. In contrast to the situation in *Morrison-Knudsen*, there is no disconnect here between the employer's contribution and the benefit received by the employee. There is no mystery about the value of a particular plan of coverage in this context, nor about the value of the employer's contribution to that plan. In fact, the employer's contribution to a worker's health insurance premium is a readily ascertainable sum that often appears on workers' pay stubs, is documented in the employer's own books, and must be reported by the employer to workers annually. See 26 U.S.C. § 6051(a)(14).

¶ 37. Moreover, in modern life, health insurance coverage is a valuable resource regardless of whether an insured requires medical treatment. The majority suggested in *Morrison-Knudsen* that the value of a worker's protection under a broad union health and welfare fund that encompassed a host of benefits, including but not limited to coverage for health care, is incalculable because it varies depending upon the worker's use of the benefits provided by that fund; this reasoning, to the extent it is persuasive at all, does not extend to this circumstance. The worker's remuneration in this case does *not* include a contingent promise for payment by

the employer of future medical costs; nothing in this record suggests that the employer would *ever* pay for the worker's health care costs. Characterizing the benefit in this case as a promise to pay for future medical expenses flies in the face of the record. The in-kind benefit provided by the employer to the worker in this case is health *insurance*.[5] The question is: Does health *insurance* have a meaningful and ascertainable value?

¶ 38. Health insurance, as distinguished from the health care for which it may ultimately pay, is a critical and valuable product in its own right. In fact, health insurance is deemed to be such an essential commodity that after 2013 most people in this country will be *required* to secure health insurance or pay a tax penalty for failing to do so. 26 U.S.C. § 5000A (describing requirement to maintain minimum essential coverage pursuant to Affordable Care Act); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, ___ U.S. ___, ___, 132 S. Ct. 2566, 2594-99 (2012) (upholding constitutionality of "individual mandate" as within Congress's taxing power).

¶ 39. The notion that health insurance is not a tangible benefit unless one "uses" it makes no more sense than the suggestion that board and lodging provided to a worker as part of compensation only count as part of wages if the worker sleeps in the lodging and eats the food, or the suggestion that the money payment a worker receives has no value as long as it sits in the worker's bank account unused. The employer's argument is especially incongruous given the Department of Labor's own conclusion that the value of a ski pass *is* a component of wages for the purpose of calculating an injured worker's average weekly wage. *Gaboric v. Stratton Mountain/Wilberton Inn*, No. 12-04WC (Apr. 26, 2004), http://labor.vermont.gov/Default.aspx?tabid=513. The Commissioner did not consider whether and how many times the injured worker actually skied using the ski pass; the cost of the

---

[5] For this reason, employer's argument that because employer paid the health insurance premium contributions directly to the insurer, claimant did not "receive" anything from the employer misses the point. Claimant does not argue that the health insurance benefit was a "cash" benefit; the question in this case is whether it is the sort of *in-kind* benefit encompassed within the definition of wages. Lodging, board, or fuel provided by an employer to a worker is unquestionably a benefit "receive[d] from the employer as a part of [ ] remuneration," regardless of whether the employer pays a third-party landlord, fuel dealer, or restaurant to supply these in-kind benefits. Employer in this case undisputedly provided the in-kind benefit of health insurance *to claimant*. The fact that employer paid a third-party vendor to supply the insurance is immaterial to the analysis.

ski pass itself was the basis for the Commissioner's valuation of that benefit. *Id.*

¶ 40. Like an apartment or a ski pass — regardless of how much it is used — health insurance has a significant and determinable value[6]; insurance companies charge, and individuals and businesses pay, substantial sums in the health insurance market. The suggestion that health insurance has no ascertainable value beyond the future health care for which it might pay ignores this modern economic reality.

¶ 41. Not only is *Morrison-Knudsen* distinguishable, but the Court's opinion in that case is less persuasive than Justice Marshall's dissent when applied to Vermont's workers' compensation statute. Justice Marshall recognized that the LHWCA, like the New York workers' compensation law upon which it was substantially based, was directed at the "loss of earning power." 461 U.S. at 640 (Marshall, J., dissenting). He reasoned:

> Viewed against this background, the term "wages" as used in the 1927 Act should encompass employer-funded benefits because those benefits indisputably represent a portion of the employee's earning power. Union members with various benefits that they have collectively bargained for clearly have a greater earning capacity than employees with equal take-home pay but without such benefits. For the purposes of determining a worker's earning power, there is no principled distinction between direct cash payments and payments into a plan that provides benefits to the employee.

*Id.* at 641.

¶ 42. Responding to the majority's view that the value of the benefits was nonetheless too difficult to calculate and therefore not properly considered as part of wages, Justice Marshall said:

> In my view, it is better to be roughly right than totally wrong. The trust funds obviously have *some* value for employees and simply to exclude them from consideration is hardly an appropriate response to uncertainty about

---

[6] Nationally, the average premium in 2012 was $5615 for single coverage, and $15,745 per year for family coverage. Kaiser Foundation Survey, *supra*, at 21. The cost of health insurance coverage is not only readily ascertainable, but is quite substantial.

> their precise value. In addition, the statute itself calls
> only for inclusion of "the *reasonable* value" of noncash
> items. While an employer's contribution may understate
> the true value of the benefits received under the collec-
> tive bargaining agreement, it nonetheless provides a
> readily identifiable and therefore reasonable surrogate for
> the "advantage" received.

*Id.* at 642-43 (Marshall, J., dissenting) (citation omitted). As noted above, the market value of an employer's contribution to a worker's health insurance premium is much clearer than the value of the broad trust fund benefits Justice Marshall was considering in *Morrison-Knudsen.* His observation that in service to the statute's language and purpose, "it is better to be roughly right than totally wrong." *id.,* applies with even greater force in this case given that the value of a particular plan of coverage is, in the modern insurance market, reflected by the premium associated with that plan.

¶ 43. Even if the "other advantages" in Vermont's definition of wages had to be similar to board, lodging, and fuel, I would reach the same conclusion. In determining what kind of benefit is "similar" to those on the list, I ask: Similar in what way? What is the unifying principle that connects these in-kind benefits? Board, lodging, and fuel were "the known non-cash components of an employee's earning power" at the time the workers' compen- sation laws were first enacted. *Id.* at 642. Given the purposes of the workers' compensation laws, health insurance — a vital necessity of living in modern times, and the single biggest noncash component of most workers' total compensation — has the same role and at least as much significance today as board, lodging, and fuel did in the past. I see no principled basis for concluding that health insurance is different in kind, or different with respect to the purposes of the workers' compensation laws, from these other components of remuneration.[7]

---

[7] The exclusion of employer-provided health insurance coverage from the calcula- tion of an injured worker's average weekly wage is especially incongruous given the employer-provided in-kind benefits that the Commissioner has concluded *should* be considered in calculating average weekly wage. See *Gaboric,* No. 12-04WC (ski pass); Workers' Compensation Board: *Estate of Lyons v. American Flatbread/Peerless Ins. Co.,* No. 36R-03WC (Nov. 3, 2003), http://labor.vermont.gov/ Default.aspx?tabid=791 (massages).

¶ 44. My construction not only honors the clear language of the statute, but also best promotes a core purpose of the workers' compensation system: to protect workers' earning power. Consider two workers: The first earns $600 per week plus individual health insurance coverage, which the employer covers at 100% for $100 per week. The second earns $700 per week, but because she has no employer-supported health insurance coverage, she has to procure it through another source. Although their cash wages are different, their total earnings are comparable. Assuming that the second can buy individual coverage for a price comparable to the rates available to the first through his employer, their standards of living, after securing health insurance, are likewise comparable. Now assume that they both suffer disabling injuries that prevent them from working, triggering temporary total disability payments. The first stops receiving $600 per week, and is forced to assume the cost of her health insurance through COBRA, at an additional cost to her of $100 per week.[8] The second stops receiving $700 per week, and continues to bear the cost of purchasing health insurance through another source.

¶ 45. Pursuant to the majority's opinion, the first of these workers will have $300 per week in earnings after receiving a weekly workers' compensation benefit and paying the previously employer-covered insurance premium; the second will have $366 after insurance premiums — substantially more than the first. It doesn't make sense that two workers with comparable preinjury earning power and actual earnings should receive such disparate support following a disabling injury solely because their respective compensation packages, although comparable in total compensation provided, were constructed differently. See *Clodgo*, 166 Vt. at 550, 701 A.2d at 1045 (Court should not affirm interpretation that

---

[8] Pursuant to the rules and decisions of the Department of Labor, if the employer continues its contributions to the injured worker's health insurance plan notwithstanding the worker's disability from work, the value of that benefit would *not* be included in the calculation of the worker's average weekly pay for the purposes of temporary total disability benefits, but *would* be included for the purposes of permanent partial disability benefits. See Vermont Workers' Compensation & Occupational Rules 15.4130, 3 Code of Vt. Rules 24-010-003 (value of benefits worker continues to receive during temporary total disability not counted in calculating compensation rate); see *Donovan v. AMN Healthcare*, No. 12-11WC (May 26, 2011), http://www.labor.vt.gov/portals/0/WC/DonovanMSJ.pdf (housing allowance included in calculation of average weekly wage for purposes of permanent partial disability benefits even though it was never discontinued by employer).

is unjust or unreasonable); *In re Williston Inn Group*, 2008 VT 47, ¶ 16 (rejecting interpretation that undermines regulatory purpose of statute).

¶ 46. My view is also fully consistent with another important purpose of the workers' compensation laws: to provide limited and determinate liability to employers. *Quinn*, 124 Vt. at 124, 197 A.2d at 797. There is nothing open-ended or uncertain about the cost of health insurance premiums.[9] The employer is as cognizant of its contributions to an employee's health insurance coverage as it is of its cash payments to workers. Both are clearly identifiable, documented, and reported sums.

## III.

¶ 47. Courts that have considered the issue in the context of their own state workers' compensation schemes have come down both ways. Although other courts' analyses may be limited in their persuasiveness given differences in states' workers' compensation statutes, other courts' decisions are nonetheless instructive. See *State v. Deyo*, 2006 VT 120, ¶ 23 n.5.

¶ 48. The primary case relied upon by claimant is the Washington Supreme Court's decision in *Cockle v. Department of Labor & Industries*, 16 P.3d 583 (Wash. 2001), in which that court considered whether employer contributions to health insurance coverage were components of "wages" in that state's workers' compensation statute. The statute in question was very similar to Vermont's, defining wages to include "the reasonable value of board, housing, fuel, or other consideration of like nature received from the employer as part of the contract of hire." *Id.* at 584. The court construed the phrase "board, housing, fuel, or other consideration of like nature" to refer to "identifiable and reasonably calculable in-kind components of a worker's lost earning capacity at the time of injury that are critical to protecting workers' basic health and survival," and concluded that "[c]ore, *non* fringe benefits such as food, shelter, fuel, and health care all share that 'like nature.'" *Id.* at 584, 593-94. The Washington legislature codified the court's ruling in 2007. See Wash. Rev. Code Ann. § 51.08.178.

---

[9] Determining the value of employer-provided *lodging*, which is expressly included in the statute, is actually far more complicated than determining the value of employer-provided health insurance.

¶ 49. The Colorado Court of Appeals likewise construed the phrase "board, rent, housing, lodging, or any other similar advantages received from the employer" to include health insurance, and held that an employee's replacement cost for securing insurance, less any employee contribution toward the insurance previously provided by the employer, was the measure of the value of the insurance benefit. *State Comp. Ins. Auth. v. Smith*, 768 P.2d 1256, 1258-59 (Colo. App. 1988). The Colorado legislature subsequently codified the inclusion of health insurance coverage in the definition of wage and expanded the impact of that inclusion by valuing the coverage with reference to the employee's replacement cost, without regard to the employee's prior contributions. *Humane Soc'y of Pikes Peak Region v. Indus. Claim Appeals Office*, 26 P.3d 546 (Colo. App. 2001); see also *Ex parte Murray*, 490 So. 2d 1238, 1240 (Ala. 1986) (health insurance fell within statutory definition that included in earnings "[w]hatever allowances of any character made to an employee in lieu of wages [and] specified as part of the wage contract" (quotation omitted)); *Ciampi v. Hannaford Bros.*, 681 A.2d 4 (Me. 1996) (health insurance fell within statute that included "[a]ny fringe or other benefit paid by the employer that does not continue during the disability" in calculation of average weekly wage).

¶ 50. Other states have broad statutes that expressly include employer-provided health insurance benefits in the base-wage calculation. See, e.g., Fla. Stat. Ann. § 440.02(28) (including in wages "employer contributions for health insurance for the employee or the employee's dependents"); Kan. Stat. Ann. § 44-511(a)(2)(A)(ii) (expressly including employer-provided insurance in definition of wage); Mich. Comp. Laws Ann. § 418.371(2) (including fringe benefits not continued during disability in calculation of average weekly wage, subject to cap).

¶ 51. To be sure, many courts applying their own state statutes have held that health insurance benefits, in the form of premiums or partial premiums, are not included in the base wage calculation. Courts in these cases have generally followed the reasoning of *Morrison-Knudsen*, construed a more narrow statute, or both. In *Lazarus v. Industrial Commission of Arizona*, 947 P.2d 875 (Ariz. Ct. App. 1997), cited by the majority, the court declined to include health insurance benefits within the definition of wages. Significantly, and in contrast to Vermont's statute, the Arizona statute before that court defined "average monthly wage" as "the average

wage paid during and over the month in which the employee is killed or injured" and provided no further guidance about the definition of wage or the propriety of including in-kind benefits such as board and lodging. *Id.* at 877. The inclusion of some in-kind benefits as wages under the Arizona statute arose not from any specific legislative guidance but, rather, from judicial construction of the term "wage." *Id.* In addition to following the analysis of *Morrison-Knudsen*, the court emphasized that the Arizona statute in question was not susceptible to as broad a construction as the statutes before the courts that had included health insurance benefits in the base wage calculation. *Id.* at 878. Likewise, the statute before the court in *Groover v. Johnson Controls World Service,* 527 S.E.2d 639, 641 (Ga. Ct. App. 2000), included no language defining "wages" or suggesting, as does the Vermont statute, that the definition of "wages" for the purpose of the workers' compensation law was broader than the ordinary understanding of that word.

¶ 52. The lessons from these out-of-state cases are two-fold: First, the fact that a number of states include employer-provided health insurance coverage in the calculation of base wage — some expressly by statute and some by judicial construction of more general statutes — undermines the employer's suggestion that such a system is unworkable. Second, the primary rationales underlying those opinions that exclude health insurance coverage from the calculation of base wage are either inapplicable to our case (because the statutes in question don't contain broad language like the Vermont statute), or are unpersuasive for the same reasons as the majority's opinion in *Morrison-Knudsen.* The two courts that have considered language most nearly identical to, albeit somewhat narrower than, Vermont's have concluded, as I do, that the language and purposes underlying the respective statutes support inclusion of employer-provided health insurance in the calculation of base wage.

IV.

¶ 53. I recognize that the statute in question predates the ascendance of widespread employer-provided health insurance by many decades, and that the Legislature that launched Vermont's workers' compensation system in 1915 did not anticipate the specific question presented by this case. In the absence of clear language and a well understood statutory purpose illuminating the

Legislature's intent, the vintage of the statute we are construing might provide a rationale for acceding to the Department's now-established practice of excluding an employer's health insurance contributions from the weekly wage calculation. But where the Legislature has spoken clearly, our obligation is to give effect to its intent — whether it expressed that intent through legislation a year ago, a decade ago, or a century ago. As Justice Marshall recognized in his *Morrison-Knudsen* dissent: "Old laws apply to changed situations. The reach of [an] act is not sustained or opposed by the fact that it is sought to bring new situations under its terms. While a statute speaks from its enactment, even a criminal statute embraces everything which subsequently falls within its scope." 461 U.S. at 638 (alteration in original) (quoting *Browder v. United States*, 312 U.S. 335, 339-40 (1941)); see also *Griffiths v. Comm'r of Internal Revenue*, 308 U.S. 355, 358 (1939) ("Legislative words are not inert, and derive vitality from the obvious purposes at which they are aimed.").

¶ 54. Having discerned the Legislature's intent from the statute that it passed, I cannot conclude that the Legislature's failure to amend that statute in the face of the Commissioner's two-decade long interpretation amounts to legislative acquiescence reflecting a new legislative intent. This Court has recognized that, "[a]lthough some courts have held that legislative inaction following a contemporaneous interpretation is evidence of that legislature's intent to adopt the interpretation, '[t]he acquiescence of the legislature seems to be of small consequence where the statute or its contemporaneous interpretation was not called to the legislature's attention.'" *Lake Bomoseen Ass'n v. Vt. Water Res. Bd.*, 2005 VT 79, ¶ 21, 178 Vt. 375, 886 A.2d 355 (quoting 2B N. Singer, Sutherland on Statutes and Statutory Construction § 49:10, at 112-14, 117 (6th ed. 2000)). We have quoted approvingly the recognition that "'[l]egislative inaction has been called a 'weak reed upon which to lean' and a 'poor beacon to follow' in construing a statute.'" *Id.* (quoting 2B Singer, *supra*, § 49:10, at 117).

¶ 55. There is no basis in the record or briefing for concluding that the Legislature has considered the question since the Commissioner determined that health insurance coverage was *not* included within the definition of wages. In fact, the only change the Legislature has *ever* made to the definition of "wages" in § 601(13) was its addition of bonuses to the types of remuneration included — a change that dates back to 1955. See 1955, No. 228,

§ 2. Given the absence of evidence that the Legislature engaged with the issue and opted to leave the Commissioner's interpretation intact, or even that the Legislature was aware of the Commissioner's interpretation, I cannot divine a new legislative intent that supersedes that expressed in the statute.

¶ 56. As the majority affirms, this is ultimately a question for the Legislature. I do not share the majority's view of what the Legislature has already said on the subject, but take heart in the knowledge that if today's Legislature concludes that the average weekly wage calculation should reflect the value of employer contributions for employee health insurance, it can amend the statute accordingly.

¶ 57. I am authorized to state that Chief Justice Reiber joins this dissent.